AMERICAN CYANAMID COMPANY,
Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

BRISTOL–MYERS COMPANY and Bristol
Laboratories Inc., Petitioners,

v.

FEDERAL TRADE COMMISSION,
Respondent.

CHAS. PFIZER & CO., Inc., Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

OLIN MATHIESON CHEMICAL COR-
PORATION, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

The UPJOHN COMPANY, Petitioner,

v.

FEDERAL TRADE COMMISSION,
Respondent.

Nos. 15805, 15797, 15801, 15806, 15788.

United States Court of Appeals
Sixth Circuit.

June 16, 1966.

Gerhard A. Gesell, Washington, D. C., Nestor S. Foley, Covington & Burling, Washington, D. C., on brief; Murray D. Welch, Jr., Kalamazoo, Mich., of counsel, for petitioner Upjohn Co.

Merrell E. Clark, Jr., New York City, Winthrop, Stimson, Putnam & Roberts, New York City, on brief; Peter H. Kaminer, Terence H. Benbow, Harry A. Garfield, New York City, Taft, Stettinius & Hollister, Cincinnati, Ohio, Robert T. Keeler, Paul R. Moran, Cincinnati, Ohio, of counsel, for petitioners Bristol-Myers Co. and Bristol Laboratories, Inc.

John E. F. Wood, New York City, and Arthur G. Connolly, Wilmington, Del., Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Thomas S. Lodge, Connolly, Bove & Lodge, Wilmington, Del., Frost & Jacobs, Cincinnati, Ohio, on brief; Charles E. Stewart, Jr., Judson A. Parsons, Jr., and Robert M. Shea, New York City, of counsel, for petitioner Chas. Pfizer & Co., Inc.

Richard Y. Holcomb and Walter R. Mansfield, New York City, Ralstone R. Irvine, and Kenneth N. Hart, Donovan, Leisure, Newton & Irvine, New York City, Powell McHenry, Dinsmore, Shohl, Barrett, Coates & Deupree, Cincinnati, Ohio, on brief, for petitioner American Cyanamid Co.

Allen F. Maulsby, New York City, Cravath, Swaine & Moore, New York City, on brief; Alan J. Hruska, W. Frazier Scott and John F. Bradley, New York City, of counsel, for petitioner Olin Mathieson Chemical Corporation.

Frederick H. Mayer, Federal Trade Commission, Washington, D. C., James McI. Henderson, General Counsel, J. B. Truly, Asst. General Counsel, Jerold D. Cummins, Attorneys, Federal Trade Commission, Washington, D. C., on brief, for respondent.

Arnold & Porter, Paul A. Porter, Abe Krash, John D. Hawke, Jr., Daniel A. Rezneck, Washington, D. C., Morgan, Finnegan, Durham & Pine, George B. Finnegan, Jr., Hobart N. Durham, Jerome G. Lee, David H. Pfeffer, New York City, for McKesson & Robbins, Inc., amici curiæ.

Before O'SULLIVAN, PHILLIPS and CELEBREZZE, Circuit Judges.

HARRY PHILLIPS, Circuit Judge.

This case presents for review an order of the Federal Trade Commission holding that petitioners violated Section 5 of the Federal Trade Commission Act,[1] in connection with the production and sale of tetracycline, which is described as "currently the best selling wonder drug in the United States."[2]

The Antibiotics Industry

Tetracycline, a broad-spectrum antibiotic, is sold and distributed under various trade names by all five petitioners: Chas. Pfizer & Co., Inc. ("Pfizer"), American Cyanamid Company ("Cyanamid"), Bristol-Myers Company and Bristol Laboratories ("Bristol"), Olin Mathieson Chemical Corporation through its E. R. Squibb & Sons Division ("Squibb") and the Upjohn Company ("Upjohn"). Pfizer owns the patent on tetracycline and produces it in addition to selling and distributing.

Under licenses granted by Pfizer, Cyanamid and Bristol also produce this antibiotic as well as selling and distributing it. Squibb and Upjohn sell and distribute by authority of licenses granted by Pfizer.

Also involved are two older antibiotics: (1) chlortetracycline, which is produced and sold by Cyanamid, owner of its patents, as aureomycin; and (2) oxtetracycline, which is produced and sold by Pfizer, owner of its patent, as terramycin.

Antibiotics are chemical substances produced by certain microorganisms. They have the capacity to counteract and cure a broad variety of diseases. At the end of World War II, penicillin was the principal antibiotic. It was a "narrow-spectrum" drug with more limited effectiveness than the later "broad-spectrum" antibiotics. Penicillin was not patented. Its production and sale proved to be fiercely competitive and profits were marginal.

The antibiotics involved in this case were described by the Commission as follows:

"The earlier antibiotics such as penicillin and streptomycin are known as narrow spectrum antibiotics because they are normally effective against either gram-positive or gram-negative bacteria but not both. The antibiotics with which this case is concerned are known, beginning with the discovery of Aureomycin, as broad spectrum antibiotics because they are effective against a far wider range of bacteria, including both gram-positive and gram-negative bacteria. Because of their wide-range of efficacy against practically all infectious diseases, the broad spectrum antibiotics have become known popularly as 'wonder drugs'. Their use results in a marked decrease in the cost of treating those diseases, and they presently are prescribed in substantially all instances in which they are effective. Antibiotics are also employed to prevent infection or disease as, for example, prior to surgery, and to prevent recurrences of infection and disease. Antibiotics are, therefore, of vital and unique importance to the health and welfare of the general public.

* * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

1. 15 U.S.C. § 45(a) (1): "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful."

15 U.S.C. § 45(a) (6): "The Commission is empowered and directed to prevent persons, partnerships, or corporations

2. N.Y. Times, March 29, 1964, § 1, p. 1, col. 1. See discussion of this case in 77 Harv.L.Rev. 1505.

"Antibiotics, including tetracycline, Aureomycin and Terramycin, as all ethical drugs, are products which can be obtained by the ultimate consumer or patient only under the authority of a doctor's prescription. Each is customarily prescribed by the physician under the respective brand name of the manufacturer, rather than its generic or chemical name. It is the physician's prescription which determines the amount and brand of drug which the pharmacist will sell. Consequently, respondents direct a major portion of their sales and promotional efforts at physicians, emphasizing their respective trade names. By law and custom pharmacists are prohibited from substituting one brand of an ethical drug for another without permission of the physician."

### Proceedings before Patent Office

When Cyanamid obtained a patent on aureomycin in 1949, the molecular structure of that drug was not known. The patent application described it in terms of certain secondary chemical properties. In 1952 the molecular structure was discovered, and a Pfizer scientist speculated that an antibiotic of at least equal strength could be produced by altering only slightly the structure of aureomycin. The result was a vastly improved antibiotic, tetracycline, which first was produced by Pfizer scientists in 1952.

Within six months of the discovery of tetracycline, both Pfizer and Cyanamid filed applications for patents.[3] The Patent Office declared an interference, which was settled as a result of a private cross-licensing agreement between Pfizer and Cyanamid to the effect that the party found to have priority would license the other. Thereafter Cyanamid conceded priority to Pfizer and withdrew its application.

Bristol then filed a patent application. A second interference was declared. The patent examiner filed an opinion which concluded that tetracycline was unpatent-able. Pfizer thereupon submitted affidavits to the effect that tetracycline could not be recovered from broths representative of those described in the Cyanamid patent application on aureomycin. Shortly afterwards a product patent was issued to Pfizer.

The proceedings before the Commission primarily were concerned with the events leading up to the issuance of the tetracycline patent to Pfizer, which are described in some detail later in this opinion, the subsequent conduct of Pfizer and Cyanamid in exploiting the patent and the conduct by the five petitioners which the Commission found to constitute a conspiracy to fix the price of this drug.

### The Complaint

The Commission's complaint, filed July 28, 1958, charged that Pfizer made false, misleading and incorrect statements to, and withheld material information from, the Patent Office for the purpose and with the effect of inducing the issuance of a patent on tetracycline; and that Cyanamid and Bristol withheld from the Patent Office material information in the course of the prosecution of the patent applications, as a result of which Pfizer was aided in obtaining its tetracycline patent.

It was further charged that, while both of their patent applications were pending, Pfizer and Cyanamid agreed that they would settle privately between themselves the question of which had priority on the invention of tetracycline, after which they would cooperate in securing the awarding of a patent to the winner; that the owner of the patent then would license the unsuccessful party; and that the two would exchange information concerning the production of this drug.

The complaint avers that, pursuant to the terms of this prior agreement, Pfizer issued a license to Cyanamid to manufacture and sell the newly patented antibiotic. Cyanamid agreed to license Pfizer to use the process covered by the aureomycin patents in the production of tetra-

---

3. Pfizer's application is described in the record as the "Conover application" and Cyanamid's as the "Boothe-Morton application."

cycline,[4] to furnish cultures and procedures for this purpose and to provide to Pfizer a quantity of bulk tetracycline so as to cut down the lead time that Cyanamid then had in the commercial marketing of the drug.

The complaint further charges that in March 1956, as a part of a settlement of an infringement suit brought by Pfizer, the latter also granted a license to Bristol to manufacture and sell tetracycline and, at the same time, licensed Squibb and Upjohn to sell this drug. It is further averred that all five petitioners fixed and maintained arbitrary and rigid prices through conspiracy and combination; and that petitioners have violated Section 5 of the Federal Trade Commission Act in that the activities of Pfizer before the patent office had and continue to have the effect of hindering, foreclosing, and eliminating competition in the sale of antibiotics and had and continue to have the dangerous tendency of creating a monopoly in Pfizer; and that all five petitioners, including Pfizer, through conspiracy and combination, have restrained, foreclosed and eliminated competition in the sale of antibiotics.

It is further charged that the antibiotics industry is one of dynamic growth, with sales exceeding $330 million per year; that tetracycline enjoys the largest sale by dollar volume, aggregating more than $100 million in 1957; and that petitioners account for all of these sales.

### Proceedings Before Commission

The hearing examiner issued his initial decision, finding in favor of the petitioner drug companies on all issues, and dismissed the complaint.[5] On appeal, the Commission reversed, finding that the hearing examiner had misconstrued the actions of the patent examiner and the information which he deemed relevant to the application. The Commission found that Pfizer made deliberately false and misleading statements to, and withheld material information from, the Patent Office in securing its tetracycline patent; that this conduct amounted to "unclean hands," "inequitableness" and "bad faith" vis-a-vis the Patent Office; that Pfizer asserted monopoly rights under its patent in order to prevent competition in the tetracycline market; and that the effects of Pfizer's acts and conduct before the Patent Office have been to restrain competition, to foreclose access to substantial markets to competitors and potential competitors, and to create a monopoly in the manufacture and sale of tetracycline in violation of Section 5 of the Federal Trade Commission Act.

The Commission further found that Cyanamid made erroneous representations to the Patent Office concerning matters bearing upon the patentability of tetracycline; and that although Cyanamid soon discovered that these representations were inaccurate, it did not disclose this fact to the Patent Office until after the tetracycline patent had been granted to Pfizer, thereby aiding the latter in its efforts to obtain a patent. The Commission ruled that this suppression of material information, combined with the cross-licensing agreement between Pfizer and Cyanamid and the acceptance by the latter of a license from the former to produce and sell tetracycline, constituted an illegal attempt to share a monopoly with Pfizer and amounted to a combination in restraint of trade. Similar charges against Bristol, Squibb and Upjohn were dismissed by the Commission, although these latter three companies were found guilty of price-fixing.

On the issue of price-fixing, the Commission decided that the record as a whole sustains the conclusion that the five petitioners fixed and maintained the price of tetracycline in substantial markets through conspiracy and combination.[6]

---

4. This was first license ever granted by Cyanamid under its aureomycin patents.

5. Summarized in Trade Reg.Rep. ¶ 15537 at pp. 20403–06 (1961).

6. Trade Reg.Rep. ¶ 16527, pp. 21,389–21,445 (August 8, 1963); and ¶ 16699, pp. 21600–21606 (December 17, 1963).

In August 1963 the Commission released the first two paragraphs of its final order, dealing only with the price-fixing aspects of this case. All five petitioners were ordered to cease and desist from (A) raising, fixing, stabilizing or maintaining prices or terms or conditions of sale; (B) discussing, conferring on or exchanging information for the purpose and with the effect of price-fixing; and (C) submitting collusive or rigged bids to purchasers or potential purchasers. All petitioners were directed to review prevailing prices for antibiotics; to determine new prices based on each petitioner's own manufacturing and overhead costs, the margin of profit individually desired, and other lawful considerations; and to cancel existing price lists.

On the issues relating to the tetracycline and aureomycin patents, the parties were directed to submit proposed forms of order with accompanying memoranda.

Thereafter, under date of December 17, 1963, the Commission entered its final order with an accompanying opinion. (See footnote 6). In addition to the provisions relative to the price-fixing aspects of the case, this order directs Pfizer to license its tetracycline patent to any domestic applicant on a two and one-half percent royalty basis and to provide the licensees with certain technical information. Under identical terms Cyanamid is directed to license its two aureomycin patents.

### Motions to Disqualify Commission Chairman

The initial decision of the hearing examiner was announced October 31, 1961. (See footnote 5). After notice of appeal to the Commission from this decision, all five petitioners filed motions on December 13, 1961, to disqualify Chairman Paul Rand Dixon from participating in the proceeding. These motions were filed pursuant to § 7(a) of the Administrative Procedure Act, 5 U.S.C. § 1006(a), and were based upon the contention that Chairman Dixon, in his former capacity as Chief Counsel and Staff Director of the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary of the United States Senate, played an "active role" in an investigation by that Subcommittee of many of the same facts and issues and of the same parties as are involved in this proceeding, and participated in the preparation of the report of the Subcommittee on the same facts, issues and parties. These motions to disqualify Chairman Dixon were made or renewed on three separate occasions prior to the Commission's final decision. The motions were denied.

Before this court petitioners take the position that the decision and order of the Commission are void because of the participation of Chairman Dixon therein. Before proceeding to other issues, it is necessary to pass upon this question.

### The Issue of the Disqualification of the Commission's Chairman

The question of when a judicial officer is disqualified to sit in judgment in a particular case is one of the most difficult and delicate problems in judicial administration.

The basic rule was stated by the Supreme Court in In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942;

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law. Tumey v. State of Ohio, 273 U.S. 510, 532, 47 S.Ct. 437,

444, 71 L.Ed. 749. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13 [99 L.Ed. 11]."

This rule applies to the Federal Trade Commission and other such administrative tribunals under the express terms of Section 7(a) of the Administrative Procedure Act of 1946.[7]

Although the rule is clear, its application in particular cases presents practical difficulties.[8]

In approaching this problem in the present case we recognize that judicial officers "do not stand aloof on these chill and distant heights; and we shall not help the cause of truth by acting and speaking as if they do." Cardozo, The Nature of the Judicial Process, 168 (1921). It has been held that it was not necessarily "a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law." Federal Trade Commission v. Cement Institute, 333 U.S. 683, 702–703, 68 S.Ct. 793, 804, 92 L.Ed. 1010. A judicial officer is not disqualified because he "may have an underlying philosophy in approaching a specific

case." United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429. A "strong conviction" or a "crystallized point of view" on questions of law and policy are not grounds for disqualification. 2 Davis, Administrative Law, § 12.01. "Federal Trade Commissioners, like other adjudicators, are entitled to hold and express views on the laws they are charged with enforcing and applying. * * * We do not equate impartiality with utter indifference. * * We do not expect a Trade Commissioner to be neutral on anti-monopoly policies." Texaco Inc. v. Federal Trade Commission, 118 U.S.App.D.C. 366, 336 F.2d 754, 764 (dissenting opinion of Judge Washington), vacated and remanded on another ground, 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714.

All of the motions to disqualify Chairman Dixon were supported by affidavits filed with the Commission. In an effort to avoid lengthening this opinion, we are attaching as appendices the following documents:

Appendix A. Pfizer's affidavit in support of motion to disqualify Chairman Dixon. (Similar affidavits were filed by Cyanamid, Bistol, Squibb and Upjohn.)

Appendix B. Copy of a letter written by Senator Estes Kefauver to the Chairman of the Federal Trade Commission dated July 19, 1960.[9]

---

7. 5 U.S.C. § 1006(a):
 "The functions of all presiding officers and of officers participating in decisions in conformity with section 1007 of this title shall be conducted in an impartial manner. Any such officer may at any time withdraw if he deems himself disqualified; and, upon the filing in good faith of a timely and sufficient affidavit of personal bias or disqualification of any such officer, the agency shall determine the matter as a part of the record and decision in the case."

8. See e. g. Federal Trade Commission v. Cement Institute, 333 U.S. 683, 700–703, 68 S.Ct. 793, 92 L.Ed. 1010; Dixon, "Disqualification" of Regulatory Agency Members: The New Challenge to the Administrative Process, 25 Fed.B.J. 273

(Summer 1965); Prejudice and the Administrative Process, 59 Nw.U.L.Rev. 216, 231 (1964); Disqualification of Administrative Officials for Bias, 13 Vand.L.Rev. 713, 727 (1960).

9. The affidavit of Bristol's counsel contains the following charge with respect to this letter:
 "On July 19, 1960 a letter was sent to the Honorable Earl W. Kintner, then Chairman of the Federal Trade Commission, over the signature of Senator Kefauver, Chairman of the Subcommittee. Upon information and belief, however, on that date and for the two weeks prior thereto Senator Kefauver was engaged in a primary campaign in the State of Tennessee. Senator Kefauver's subsequent state-

Appendix C. Copy of Commission's interlocutory order denying motions to disqualify Chairman Dixon. (59 Federal Trade Commission Decisions, 1488.)

Appendix D. Memorandum of Chairman Dixon in regard to motions that he be disqualified. (60 Federal Trade Commission Decisions, 1881.)

Appendix E. Excerpts from hearings before the sub-committee on antitrust and monopoly of the Committee on the Judiciary, United States Senate, on Administered Prices in the Drug Industry, 86th Congress, 1st and 2nd Sessions, Vol. 24 (1959–1960), in which Mr. Dixon participated as Chief Counsel and Staff Director.

These appendices disclose that during a period beginning in 1959 and extending through 1960 (a time subsequent to the filing of the complaint by the Commission against petitioners in 1958) the subcommittee conducted an investigation of the drug industry, including the manufacture and sale of tetracycline. As Chief Counsel and Staff Director of the Subcommittee, Mr. Dixon played an active part in the investigation. These hearings were concerned specifically, among other things, with issues which were decided against petitioners by the Commission in the instant case and which are involved on the present petitions to review. The subcommittee received evidence relating to petitioners' prices for broad spectrum antibiotics, including tetracycline, to retailers, wholesalers, institutions and government agencies; costs and profits of petitioners; and proceedings before the patent office preceding the issuance of the tetracycline patent to Pfizer, including the interference settlement entered into between Pfizer and Cyanamid. Until the middle

of March 1961, Mr. Dixon was in charge of and personally supervised all the investigatory activities of the Subcommittee's staff; participated in the selection of witnesses to testify and the documents to be introduced in evidence; and as an attorney conducted extensive examinations of witnesses in connection with factual issues involved in the present appeals. Chairman Dixon's memorandum (Appendix D) states that "as counsel, I played an active role in the accumulation and presentation of this factual data to the members of the Subcommittee."

Some of the questions and comments of Mr. Dixon as quoted in Appendix E demonstrate to us that he then had formed the opinion that tetracycline prices quoted by petitioners were artificially high and collusive and that the patent interference settlement between Pfizer and Cyanamid involved improper aid by Cyanamid to Pfizer in obtaining the tetracycline patent. Any opinions so formed were conclusions as to facts, and not merely an "underlying philosophy" or a "crystallized point of view on questions of law or policy." The facts to which questions were directed as set forth in Appendix E are inseparably a part of the ultimate findings of fact of the Commission in disagreeing with the decision of the trial examiner in the present proceeding.

The letter of Senator Kefauver to the then Chairman of the Federal Trade Commission dated July 19, 1960 (Appendix B), expressed the view that the proposed findings of fact and conclusions of fact and law in the present proceedings "appear to be firmly based upon a large body of persuasive evidence" and that "I am confident that ultimately the Commission will reverse the hearing examiner's decisions." Petitioners charge that this letter was either prepared by

ments on September 9, 1960, when the letter was called to his attention during the Subcommittee's hearings relating to antibiotics, would seem to indicate that he had little previous knowledge of it (Hearings on Administered Prices before the Subcommittee on Antitrust and Monopoly of the Committee on the

Judiciary, United States Senate, pursuant to S.Res. 238, 86th Cong., 2d Sess. vol. 24, pp. 13,893–7). Upon information and belief the letter of July 19, 1960 was either prepared by Chairman Dixon or by someone on his staff at his direction or with his approval."

Mr. Dixon or by someone on his staff at his direction or with his approval. This charge is not denied in the record before this court.

The report of the Subcommittee (S. Rep. No. 448, 87th Cong., 1st Session (1961)) contains the following language dealing with issues in the present case:

"The most important and well-known example of the emergence of oligopoly from this process of mutual accommodation is the important antibiotic, tetracycline—manufactured by three of the leading drug companies and sold by five. * * * Moreover, it was touch-and-go whether the product was even patentable. To the intense distress of the companies, it developed that some quantities of tetracycline are obtained in the production of chlortetracycline—a fact which might well make the product unpatentable. The problem was further aggravated by laboratory and clinical tests which appeared to indicate that tetracycline is superior to its patented predecessors–chlortetracycline and oxytetracycline. Under these circumstances the prospects of a repetition in the broad spectrums of what was so widely deplored in penicillin—free competition, falling prices and shrinking profit margins—appeared very real indeed.

"It was against this background that the companies *made their legal maneuvers with the twofold objective in mind—to assure the issuance of a patent and to secure the patent for themselves.*" Report, supra, p. 145.

* * * * * *

"Although, under the earlier private agreement between Cyanamid and Pfizer, it was Pfizer who was to get the tetracycline patent, the latter could not act since no patent had yet been issued. Cyanamid then moved into the breach; on September 29, 1954, it instituted action against Bristol on the ground that Bristol's manufacture of tetracycline infringed Cyanamid's Aureomycin patent. * * *

"Pfizer, however, persisted in its submission of affidavits to overcome the rejection by the patent examiner, who asked if tetracycline could be shown to be present in Aureomycin 'in clearly identifiable form.' Pfizer scientists conducted tests purporting to prove that Aureomycin fermentation broth did not contain tetracycline. Using what Pfizer itself described as 'low potency' broth and 'commercial' tests, a negative result was secured, although the use of known sensitive tests would have shown the presence of identifiable tetracycline in the broth. In an affidavit submitted to the Patent Office, the Pfizer scientist swore that 'in fact there was no indication whatever of the presence of tetracycline'. This led the patent examiner to grant the patent to Pfizer. [File, U. S. Patent No. 2,699,054. *The validity of this assertion is a central point at issue in the FTC case, docket 7211, In the Matter of American Cyanamid et al.*] On the same day separate infringement actions were instituted by the patentee against Bristol, Upjohn and Squibb.

"This set the scene for the end of the matter. On January 13, 1955, Cyanamid's infringement action against Bristol was settled with a license by Cyanamid for use of its Aureomycin patent in the manufacture of tetracycline. In return, Bristol agreed to pay royalties to Cyanamid on all of its sales of tetracycline." Id. at p. 146.

* * * * * *

"Then suddenly the controversy was stilled. In March 1956 the six lawsuits then pending were privately settled in a series of agreements among the companies. * * *

"With the consummation of these arrangements, the *orderly and controlled* marketing of tetracycline was an inevitable and expected result. * * * all five have consistently sold at identical prices, * * *." Id. at p. 147. (Emphasis supplied.)

The letter of Senator Kefauver transmitting the report to the Chairman of the Senate Committee on Judiciary expressed appreciation for the "efforts of Paul Rand Dixon, formerly counsel and staff director, and Dr. John M. Blair, chief economist, both in the work of the hearings on which this report is based and the assistance they rendered the Committee in the preparation of this report."

We do not find in the record before us a denial of the charge that Mr. Dixon, in his capacity as Counsel and Staff Director, assisted in the preparation of the report of the Senate Subcommittee, incl·.ding the language above quoted.

We are not impressed with the Commission's argument that the proceedings before the Senate Subcommittee had no relationship to the proceedings before the Commission because the former were "legislative" and "investigative" in nature. The record shows that the activities of the Subcommittee went beyond the scope of the ordinary legislative committee hearings. The report of the Subcommittee demonstrates that it extended its activities to the full limits of the Senate authorization, which included the power "to make a complete, comprehensive and continuing study and investigation of the antitrust and monopoly laws of the United States and their administration, interpretation, operation, enforcement and effect."

█ Under the facts and circumstances of this case we conclude that the participation of Chairman Dixon in the hearing "amounted * * * to a denial of due process which invalidated the order under review." Texaco, Inc. v. Federal Trade Commission, supra, 118 U.S. App.D.C. 366, 336 F.2d 754, 760, vacated and remanded on other grounds. 381 U.S. 739, 85 S.Ct. 1798, 14 L.Ed.2d 714.

As said in Amos Treat & Co. v. Securities and Exchange Commission, 113 U.S. App.D.C. 100, 306 F.2d 260, 267:

"[A]n administrative hearing of such importance and vast potential consequences must be attended, not only with every element of fairness but with the very appearance of complete fairness. Only thus can the tribunal conducting a quasi-adjudicatory proceeding meet the basic requirement of due process."

In Trans World Airlines v. Civil Aeronautics Board, 102 U.S.App.D.C. 391, 254 F.2d 90, 91, Judge Prettyman said:

"It is plain that in this statute Congress contemplated an adjudicatory proceeding and conferred upon the Board in this respect quasi-judicial functions. The fundamental requirements of fairness in the performance of such functions require at least that one who participates in a case on behalf of any party, whether actively or merely formally by being on pleadings or briefs, take no part in the decision of that case by any tribunal on which he may thereafter sit."

It is fundamental that both unfairness and the appearance of unfairness should be avoided. Wherever there may be reasonable suspicion of unfairness, it is best to disqualify. See Prejudice and the Administrative Process, 59 Nw.U.L.Rev. 216, 231 (1964); Disqualification of Administrative Officials for Bias, 13 Vand. L.Rev. 713, 727 (1960).

It is to be emphasized that the Commission is a fact-finding body. As Chairman, Mr. Dixon sat with the other members as triers of the facts and joined in making the factual determination upon which the order of the Commission is based. As counsel for the Senate Subcommittee, he had investigated and developed many of these same facts.

█ The result of the participation of Chairman Dixon in the decision of the Commission is not altered by the fact that his vote was not necessary for a majority. "Litigants are entitled to an impartial tribunal whether it consists of one man or twenty and there is no way which we may know of whereby the influence of one upon the others can be quantitatively measured." Berkshire Employees Association of Berkshire

Knitting Mills v. N. L. R. B., 121 F.2d 235, 239 (C.A.3).

We therefore must vacate the order and decision of the Federal Trade Commission and remand the case for a de novo consideration of the record without the participation of Chairman Dixon. We reject the argument of the Commission that such a holding "would create an unworkable concept of administrative bias." Our decision on this issue goes no further than to hold that disqualification is required when, as in the present case, the legislative committee investigation involved the same facts and issues concerning the same parties named as respondents before the administrative agency, and to the extent here presented. We do not hold that the service of Mr. Dixon as counsel for the subcommittee, standing alone, necessarily would require disqualification. Our decision is based upon the depth of the investigation and the questions and comments by Mr. Dixon as counsel, as shown by the record in this case, including Appendix E.

It has not been a rare occurrence in judicial history for an Attorney General or Solicitor General of the United States to be appointed to the Supreme Court. The practice of the justices so appointed in recusing themselves from participating in the decision of cases in which they were active while with the Department of Justice has not handicapped the President in making appointments of capable judges or created an "unworkable concept of judicial bias."

In holding that Chairman Dixon was disqualified to sit in this case, it is not the intention of this court to reflect in any way upon or question in the slightest degree the integrity, ability or dedication of the distinguished Chairman of the Commission.

### The Issue as to the Jurisdiction of the Commission

For the assistance of the Commission on remand we deem it advisable to pass upon two additional issues that are pressed by the petitions to review: (1) whether or not the Commission has juris-diction; and (2) whether the findings of the Commission with respect to the proceedings in the Patent Office involving the granting of the tetracycline patent are supported by substantial evidence.

The jurisdictional issue may be stated as follows: Assuming that a patent is obtained by misrepresentation and improper conduct in the proceedings before the Patent Office, does the Federal Trade Commission have jurisdiction to hold that the subsequent use of such a patent for the purpose of excluding competition constitutes an unfair method of competition under Section 5 of the Act and, in fashioning a remedy, to order compulsory licensing of the patent upon a reasonable royalty basis? For the purpose of our discussion of the jurisdictional question we assume the facts to be as found by the Commission. The issue of the sufficiency of the evidence on this question will be discussed later in this opinion.

The Commission held as follows:

"We are not holding that every misrepresentation of fact or withholding of material information before the Patent Office necessarily constitutes *per se* an unfair method of competition under the Federal Trade Commission Act. Some patents may be commercially worthless or have no adverse effects on competition. The facts of this case, however, are that a patentee has asserted monopoly rights under a patent so acquired and, as a consequence thereof, has restrained competition in the manufacture and sale of an important antibiotic; in at least one year the annual sales of tetracycline exceeded $100,000,000. The record further discloses that numerous drug houses have endeavored to enter the tetracycline market. All have been refused with the exception of respondents Cyanamid, Bristol, Squibb and Upjohn."

■■ It is well settled that the Commission may exercise only the powers granted to it by the Act. Federal Trade Commission v. National Lead Co., 352 U.S. 419, 428, 77 S.Ct. 502, 1 L.Ed.2d

438; Federal Trade Commission v. Western Meat Co., 272 U.S. 554, 559, 47 S.Ct. 175, 71 L.Ed. 405. It is equally well settled that in enacting Section 5 of the Act Congress intended to make a broad delegation of power to regulate and control unfair methods of competition. The legislative history shows that Congress intended to provide the Commission with broad discretion in interpreting Section 5:

"It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task." H.R. Rep. No. 1142, 63rd Cong., 2d Sess. 18–19 (1914).

As said by the Supreme Court in Atlantic Refining Co. v. Federal Trade Commission, 381 U.S. 357, 367, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443:

"Section 5 of the Federal Trade Commission Act declares '[u]nfair methods of competition in commerce, and unfair * * * acts or practices, in commerce * * * unlawful.' In a broad delegation of power it empowers the Commission, in the first instance, to determine whether a method of competition or the act or practice complained of is unfair. The Congress intentionally left development of the term 'unfair' to the Commission rather than attempting to define 'the many and variable unfair practices which prevail in commerce * * *.' S.Rep. No. 592, 63d Cong., 2d Sess., 13. As the conference report stated, unfair competition could best be prevented 'through the action of an administrative body of practical men * * * who will be able to apply the rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations.' H.R. Conf.Rep. No. 1142, 63d Cong., 2d Sess., 19. In thus divining that there is no limit to business ingenuity and legal gymnastics the Congress displayed much foresight. See Federal Trade Comm'n v. Cement Institute, 333 U.S. 683, 693, 68 S.Ct. 793, 799, 92 L.Ed. 1010 (1948). Where the Congress has provided that an administrative agency initially apply a broad statutory term to a particular situation, our function is limited to determining whether the Commission's decision 'has "warrant in the record" and a reasonable basis in law.' National Labor Relations Board v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 661, 88 L.Ed. 1170 (1944). While the final word is left to the courts, necessarily 'we give great weight to the Commission's conclusion. * * *.' Federal Trade Comm'n v. Cement Institute, supra, 333 U.S. at 720, 68 S.Ct. [793] at 812."

Pfizer and Cyanamid contend that the Commission had no power to order the compulsory licensing of their patents. Pfizer asserts that the Commission has no jurisdiction to review the proceeding in the Patent Office, to attack indirectly the validity of a patent or to "second-guess the actions of the Patent Office." This is not a correct statement of the jurisdictional issue now before us. In the present case the Commission has not undertaken to pass upon the validity of the patents in question nor has it held the patents to be invalid. The order recognizes the validity of the tetracycline and aureomycin patents but compels licensing on what the Commission found to be a reasonable royalty basis. The Commission has not ruled that the act of obtaining the tetracycline patent by misrepresentation as such constituted a violation of Section 5, but rather that the subsequent use, for purposes of excluding competition, of a patent so obtained, constituted such a violation. It found that Pfizer has employed the tetracycline patent to suppress competition by suits and threats of suits against competitors and their customers and that Cyanamid also employed its patents as a weapon toward the common objective of suppress-

ing competition. A list of thirty-six infringement actions filed by Pfizer against potential competitors and their customers is attached as Appendix F.

 In its recent opinion in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247, the Supreme Court said that the enforcement of a patent procured by fraud on the Patent Office may violate Section 2 of the Sherman Act, provided all other elements to establish a § 2 monopolization charge are proved, in which event the treble-damage provisions of § 4 of the Clayton Act would be available to the injured party. This case originated before a United States District Court, which indisputably has jurisdiction in such matters, and therefore is not controlling in the present case on the issue of the jurisdiction of the Commission. The reasoning, however, gives support to the decision of the Commission in the present case. The Court quoted with approval the following language from Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816, 65 S.Ct. 993, 998, 89 L.Ed. 1381:

> "A patent by its very nature is affected with a public interest. * * * [I]t is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their ligitimate scope."

In his concurring opinion in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., supra, Mr. Justice Harlan said:

> "To hold, as we do, that private suits may be instituted under § 4 of the Clayton Act to recover damages for Sherman Act monopolization knowingly practiced under the guise of a patent procured by deliberate fraud, cannot well be thought to impinge upon

the policy of the patent laws to encourage inventions and their disclosure. Hence, as to this class of improper patent monopolies, *antitrust remedies should be allowed room for full play.*" (Emphasis supplied.) 382 U.S. 179–180, 86 S.Ct. 351.

In his concurring opinion in United States v. Singer Manufacturing Co., 374 U.S. 174, 199–200, 83 S.Ct. 1773, 1786, 10 L.Ed.2d 823, Mr. Justice White said:

> "* * * There is a public interest here * * * which the parties have subordinated to their private ends— the public interest in granting patent monopolies only when the progress of the useful arts and of science will be furthered because as the consideration for its grant the public is given a novel and useful invention. * * * When there is no novelty and the public parts with the monopoly grant for no return, the public has been imposed upon and the patent clause subverted. * * * [C]learly collusion among applicants to prevent prior art from coming to or being drawn to the Office's attention is an equitable imposition on the Office and on the public. * * * In my view, such collusion to secure a monopoly grant runs afoul of the Sherman Act's prohibitions against conspiracies in restraint of trade—if not bad *per se*, then such agreements are at least presumptively bad."

To like effect see Kingsland, Commissioner of Patents v. Dorsey, 338 U.S. 318, 319, 70 S.Ct. 123, 94 L.Ed. 123; United States v. United States Gypsum Co., 333 U.S. 364, 400, 68 S.Ct. 525, 92 L.Ed. 746.

 The Federal Trade Commission Act may be construed *in pari materia* with the Sherman and Clayton Acts. "This construction allows for using cases decided under any of the antitrust laws in dealing with cases brought by the Commission." Atlantic Refining Co. v. Federal Trade Commission, 344 F.2d 599, 606 (C.A. 6), cert. denied, 382 U.S. 939, 86 S.Ct. 391, 15 L.Ed.2d 350.

The Federal Trade Commission Act contains no statutory exemption [10] of Patent Office proceedings, and we find nothing in the Act indicating any intention to set aside the Patent Office as a "city of refuge"[11] from the Commission's jurisdiction over unfair trade practices. Assuming that a Section 5 violation of the Act occurred, growing out of and following proceedings before the Patent Office in the present case, we hold that Section 5 of the Act confers jurisdiction upon the Commission with respect thereto. Decker v. Federal Trade Commission, 85 U.S.App.D.C. 137, 176 F.2d 461, cert. denied, 338 U.S. 878, 70 S.Ct. 159, 94 L.Ed. 539; cf. Baldwin Bracelet Corp. v. Federal Trade Commission, 117 U.S.App.D.C. 85, 325 F.2d 1012, cert. denied, 377 U.S. 923, 84 S.Ct. 1221, 12 L.Ed.2d 215.

It is not accurate to accuse the Commission of "second guessing" the Patent Office. The Commission had before it evidence which it found to have been withheld from the Patent Office and passed upon a situation which the Patent Office never knew existed.

From our review of what was before the Commission in these proceedings, we are satisfied that it was within the competence of the Commission to adjudicate whether the total conduct of petitioners disclosed a violation of the Act. We hold that the Commission had jurisdiction to determine that the conduct of the parties before the Patent Office resulting in the issuance of the patent, and the subsequent use of the fruits of such conduct may, in total, be found to constitute violation of Section 5 of the Act.

Obviously there can be no question as to the jurisdiction of the Commission over the price fixing aspects of the case.

As to the authority of the Commission to prescribe a remedy, the Supreme Court in Atlantic Refining Co. v. Federal Trade Commission, supra, said:

"The Commission, of course, has 'wide discretion in its choice of a remedy deemed adequate to cope with * * * unlawful practices * * *.' Jacob Siegel Co. v. Federal Trade Comm'n, 327 U.S. 608, 611, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946). Furthermore, it acts within the limits of its authority when it bars repetitions of similar conduct with other parties. Federal Trade Comm'n v. Henry Broch & Co., 368 U.S. 360, 364, 82 S.Ct. 431, 433, 7 L.Ed.2d 353 (1962) * * *

"* * * But Congress has placed in the Commission in the first instance the power to shape the remedy necessary to deal with unfair methods of competition. We will interfere only where there is no reasonable relation between the remedy and the violation. Federal Trade Comm'n v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952)." 381 U.S. at 376–377, 85 S.Ct. at 1510.

As this court said in Sandura Co. v. Federal Trade Commission, 339 F.2d 847, 861 (C.A. 6):

"Where there has been a continued course of unlawful price maintenance by agreement, however, it is within the discretion of the Commission to determine that the only effective way to terminate the effects of the unlawful conduct is by barring an otherwise lawful course of conduct which could have the practical effect of continuing the unlawful conduct unmitigated."

In the present case the Commission was not dealing with a patent on an ordinary item of commerce, but with patents on antibiotics of vital importance in the treatment and cure of many diseases and of tremendous impact upon the public health.

Compulsory licensing of patents by the courts for patent misuse is a per-

10. The Act excludes from the Commission's jurisdiction banks, common carriers subject to acts regulating commerce, air carriers and foreign air carriers, and persons subject to the Packers and Stockyards Act of 1921, 15 U.S.C. § 45(a)(6).

11. Numbers 35:6.

missible remedy in anti-trust cases. Hartford-Empire Co. v. United States, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322; 59 Nw.U.L.Rev. 543; 38 N.Y.U.L.Rev. 1191.

We accordingly hold that, assuming the facts as found by the Commission to be supported by substantial evidence, the Commission had jurisdiction to require as a remedy the compulsory licensing of the tetracycline and aureomycin patents on a reasonable royalty basis. We do not hold that the Commission has jurisdiction either directly or indirectly to invalidate or destroy a patent, nor do we hold that the Commission could order compulsory licensing without payment of reasonable royalties. We do hold that, in exercising its broad jurisdiction in the enforcement of Section 5 of the Act, the Commission could explore means and methods employed in obtaining the patents here involved and the subsequent use of the fruits thereof, assuming the other elements of a Section 5 violation.

### The Substantial Evidence Issue

Because of our remand to the Commission, we do not express any opinion as to whether or not the findings and decision with respect to the price-fixing issues are supported by substantial evidence.

For the assistance of the Commission, however, we are passing now upon the question of whether the findings with respect to misconduct in the proceedings before the Patent Office involving the granting of the tetracycline patent, and the use made of the fruits of such misconduct, are supported by substantial evidence.

The Commission's holding of improper conduct in the Patent Office proceedings is based upon its findings that false and misleading statements were made to the Patent Office and that material information was withheld, resulting in the granting of the tetracycline patent to Pfizer.

The findings of fact of the Commission must be accepted by this court if they are supported by substantial evi-

dence on the record considered as a whole. 15 U.S.C. § 45(c); Atlantic Refining Co. v. Federal Trade Commission, supra, 344 F.2d 599 (C.A. 6), cert. denied, 382 U.S. 939, 86 S.Ct. 391, 15 L.Ed.2d 350; Sandura Company v. Federal Trade Commission, 339 F.2d 849, 856 (C.A. 6).

In the present case the hearing examiner, who heard the testimony of the witnesses, found that no misrepresentations were made to the Patent Office by Pfizer, that the patent examiner was supplied with all the information which he requested and in which he was interested concerning the coproduction or inherent production of tetracycline, and that the patent examiner was not misled or deceived by information withheld by either Cyanamid or Pfizer. The Commission disagreed with its hearing examiner and made findings of fact diametrically to the contrary.

Where the Commission overturns findings of fact of a hearing examiner, this conflict in fact findings is to be considered by a reviewing court. Procter & Gamble Company v. Federal Trade Commission, 358 F.2d 74 (C.A. 6), citing Universal Camera v. N. L. R. B., 340 U.S. 474, 496, 497, 71 S.Ct. 456, 95 L.Ed. 456 and N. L. R. B. v. Ohio Calcium Co., 133 F.2d 721 (C.A. 6).

In United States Retail Credit Association v. Federal Trade Commission, 300 F.2d 212, 217 (C.A. 4), the court said:

"As we interpret the Universal Camera decision, the reviewing court is not prevented from considering the examiner's decision; if the agency's findings are not supported by substantial evidence, and if the examiner's findings are, the agency's findings must give way to those of the examiner. The examiner's findings are not sacrosanct; there is no mandate that the Commission accept them; they are but one portion of the entire record which the court is to consider in its review."

In Benrus Watch Co. v. Federal Trade Commission, 352 F.2d 313, 321 (C.A. 8),

cert. denied 384 U.S. 939, 86 S.Ct. 1457, 16 L.Ed.2d 538, the court said:

"While the findings of the Examiner were certainly not binding upon the Commission, they are part of the record, and are entitled to consideration in appraising the correctness of the ultimate findings of the Commission."

The details of the evidence will not be discussed at greater length than necessary in this opinion. Reference is made to the initial decision of the hearing examiner, which comprises 195 pages (see footnote 5), and the opinion of the Commission, which comprises 110 pages (see footnote 6).

Sufficient for the purposes of this opinion is the following summary, which is based principally upon, and sometimes stated verbatim from, the Commission's findings of fact.

Aureomycin (patented in 1949 by Cyanamid), terramycin (patented by Pfizer in 1950) and tetracycline are produced by the fermentation of microorganisms in aqueous nutrient media. The media are inoculated with the microorganisms and under controlled and aseptic conditions the microorganisms are allowed to grow. After a period of fermentation the antibiotics are recovered from the broth. For production on a commercial scale, the fermentation is conducted in large vats and the antibiotic substance is recovered and subjected to purification procedures in order to arrive at a product suitable for therapeutic use.

Aureomycin is made by the fermentation of a species of microorganism known as Streptomyces aureofaciens, hereinafter referred to as S. aureofaciens.

Tetracycline can also be produced by subjecting aureomycin to a process of mild catalytic hydrogenation, which removes the chlorine atom from the aureomycin molecule. This chemical transformation was the original method by which tetracycline was discovered.

The patent covering aureomycin is the Duggar patent, U.S. Patent 2,482,055, issued September 13, 1949. (The Niedercorn patent, U.S. Patent 2,609,329, issued September 2, 1952, is an improvement patent on a process for producing aureomycin.) Both are owned by Cyanamid. The Sobin patent, U.S. Patent 2,516,080, covering the product terramycin, was issued to Pfizer on July 18, 1950; the Conover patent, U.S. Patent 2,699,054, covering tetracycline, was issued to Pfizer on January 11, 1955.

No company has been licensed by Cyanamid to sell aureomycin in the United States. Pfizer has been licensed to manufacture aureomycin for the limited purpose of converting it to tetracycline, and Bristol has been licensed to produce up to six per cent aureomycin in the production of tetracycline, and to sell tetracycline containing not more than six per cent aureomycin. Pfizer has licensed no company to produce or sell terramycin. As a result of their patents, Cyanamid and Pfizer have had a legal monopoly of the production and sale of aureomycin and terramycin, respectively. Pfizer has licensed Cyanamid and Bristol to manufacture and sell tetracycline, and has licensed Squibb and Upjohn to sell tetracycline.

Prior to 1952, the chemical structures of aureomycin and terramycin were unknown. During the spring of that year, a Pfizer research team headed by Dr. R. B. Woodward of Harvard University discovered the molecular structure of these two antibiotics. A member of the research team, Dr. Conover, noting the similarity in the structures of the two antibiotics, speculated that it might be possible to develop a new antibiotic by removing the chlorine atom from aureomycin. By subjecting aureomycin to mild hydrogenation by means of a catalyst such as palladium Conover removed the chlorine atom and, in June of 1952, produced tetracycline.

On August 8, 1952, an article by the Pfizer research team was submitted to the Journal of the American Chemical Society disclosing the formations and structures of aureomycin, terramycin and tetracycline. This article, referred to as the Stephens article, was published in the Journal on October 5, 1952.

On October 23, 1952, Conover filed an application for a patent claiming the product deschloroaureomycin (later called tetracycline), its salts, and a process for producing it by hydrogenation of aureomycin. On July 23, 1953, the Patent Office rejected the Conover application on the ground that the subject matter was obvious in the light of the aureomycin (Duggar) and terramycin (Sobin) patents, because of the similarity of the structural formulae of the three antibiotics.

On October 20, 1953, Pfizer filed a preliminary amendment to its patent application pointing out that the structures of aureomycin and terramycin were not known at the time of Conover's discovery of tetracycline. Thereafter, the patent examiner withdrew the rejection of the application on the aforementioned ground.

In 1948, Cyanamid had hydrogenated aureomycin and obtained a product which it later claimed was tetracycline. In December 1952, Cyanamid repeated its 1948 work and embarked upon a project in which tetracycline was produced from aureomycin by hydrogenation. On March 16, 1953, Cyanamid filed its Boothe-Morton application for a patent on tetracycline, its salts, and a process for manufacturing it by hydrogenating aureomycin.

On August 6, 1953, Cyanamid submitted an article to the Journal of the American Chemical Society describing the production of tetracycline by deschlorination of aureomycin. On August 13, 1953, Pfizer submitted a similar article to the Journal. Both articles were published in the Journal on September 20, 1953. The disclosure of tetracycline and the process of deschlorination made possible the testing of previously unknown and unrecognized antibiotics, using the revealed tetracycline as a basis for comparison.

On September 25, 1953, the Heyden Chemical Corporation announced it had discovered an antibiotic, designated HA–20A, which might be tetracycline and that this antibiotic could be produced by direct fermentation. This announcement was the subject of an article which appeared in the Journal of Commerce on October 1, 1953. On September 28, 1953, Heyden applied for a patent (the Minieri application) on HA–20A, its salts, and a process for production thereof by fermentation using a newly discovered strain of S. aureofaciens and a mutant thereof.

On November 4, 1953, Cyanamid purchased Heyden's antibiotic facilities, including the rights to the Minieri tetracycline patent application.

H. J. Lidoff, the patent examiner handling the Cyanamid and Pfizer patent applications, declared an interference between these two applicants. Under Patent Office rules, an interference is a proceeding conducted for the purpose of determining priority between two or more applicants claiming the same invention.

The first interference was terminated on February 9, 1954, following the execution of the cross-licensing agreement between Pfizer and Cyanamid. Cyanamid conceded that the Pfizer (Conover) application had priority in time and withdrew its Boothe-Morton application.

On January 15, 1954, Bristol had filed continuation applications in the Heinemann matter, claiming tetracycline hydrochloride, and contending that this product was patently distinguishable from tetracycline.

On March 2, 1954, Examiner Lidoff declared a second interference. The parties to this interference were Pfizer (Conover application), Bristol (Heinemann application) and Cyanamid (Minieri application which it had purchased from Heyden).

On October 14, 1954, Examiner Lidoff dissolved the second interference, ruling that the product tetracycline was not patentable, and rejected all product claims on the basis of coproduction, i.e. that the previously patented aureomycin process (Duggar and Niedercorn patents) inherently produced certain amounts of tetracycline. The Minieri application filed by Heyden on September 25, 1953, had disclosed that the microorganisms

used to prepare tetracycline belonged to the species used in producing aureomycin and that aureomycin was coproduced in the Minieri fermentation process. On the basis of this information, the patent examiner speculated that tetracycline was coproduced with aureomycin in the processes disclosed in the Duggar and Niedercorn patents.[12] He also held that tetracycline hydrochloride was not patently distinguishable from tetracycline.

On November 29, 1954, Pfizer's patent representatives met with Examiner Lidoff in his office concerning the rejection of the Conover application on the ground of the unpatentability of tetracycline because of inherent production. The statements made at this interview and the affidavits and statements made concerning experiments conducted as a result of this interview encompass most of the misrepresentations which the Commission found Pfizer to have made in its successful effort to persuade Examiner Lidoff to change his decision.

A written summary of this interview contains the following recitation:

"At the outset of the interview, the Assistant Examiner agreed that the discovery of the new antibiotic, tetracycline (and its salts), constituted a major advance in the art, that should merit patent protection. He further conceded that neither the Duggar nor the Niedercorn patents contains any disclosure whatsoever of this important new antibiotic nor the slightest hint as to the possible existence thereof. However, he stated that applicant's product claims appeared to be anticipated by the possible, although wholly unappreciated, co-production of appreciable amounts of tetracycline in the fermentation processes described in the cited patents.

"It was pointed out to the Assistant Examiner that there is no reasonable basis for his speculation as to the co-production of tetracycline in the prior art processes, and that the same rejection had previously been made and withdrawn in the prosecution of the Heinemann, et al. application. * * * The Examiner, however, felt that he was justified in relying upon the disclosure of the Minieri et al. application Serial No. 382,637 as giving rise to a rebuttable assumption of inherent production.

"Applicant's counsel denied that any such prima facie assumption is justified. * * *

"The available evidence is overwhelmingly contrary to the Examiner's assumption. Minieri et al themselves, in their brief on their motion to add fermentation counts in the interference * * * have stated that tetracycline could previously be produced only by deschlorination, and that there is no

12. Examiner Lidoff stated in this connection:
"The interference count is unpatantable over the disclosures of Duggar U.S. 2,-482,055, Sep't 13, 1949 and Niedercorn U.S. 2,609,329, Sep't 2, 1952, and the interference is dissolved. Duggar and Niedercorn each produce an antibiotic, disclosed as 'Aureomycin' by a fermentation process employing *Streptomyces aureofaciens* and mutants thereof. The antibiotic is identified as an antibiotic by assay against bacteria. It appears from the disclosure of Minieri et al (a party to this interference in an application available to all the parties) that tetracycline is *also* produced in such a fermentation process and that larger proportions thereof are produced when the amount of chloride in the fermenation medium is low * * * Minieri et al clearly and specifically disclose that the microorganism used to prepare *tetracycline* belongs to the Duggar et al U.S. 2,482,055 species and that 'the characteristics are identical with those exhibited by a known culture of *S. aureofaciens*'. While neither Duggar or Niedercorn may have realized that tetracycline was in fact produced, they did appreciate and disclose that the product was an antibiotic. No invention is involved in the *identification* of the tetracycline and its hydrochloride inherently produced by the reference process (see In re Lieser 1947 C.D. 447; and Allen et al v. Coe 1943 C.D. 55). It has long been held that a purer form of an old product is not inventive and the (apparent) mixture of the prior art meets the count (see Parke-Davis v. Mulford, C.C., 189 F. 95 and In re Kebrich 96 U.S.P.Q. 411)."

evidence of inherent production by the prior art processes. Most striking of all is the fact that the assignee of the Duggar and Niedercorn et al patents, who manufactured literally tons of chlortetracycline (Aureomycin) according to the methods described therein, failed to discover any tetracycline in such large-scale manufacture, although it devoted extensive research to the recovery, purification and properties of its patented antibiotic. Said assignee first claimed tetracycline (and its salts) made by a *deschlorination* process in its Boothe et al application Serial No. 342,556 filed March 16, 1953, some five years after the Duggar and Niedercorn patents were filed. This should conclusively refute the tenuous basis for the Examiner's unwarranted assumption.

\* \* \* \* \* \*

"Despite the foregoing arguments, the Examiner adhered to his position that he would not withdraw his rejection of the product claims, unless applicant submits a showing overcoming his speculated basis for such rejection. He explained that he would require evidence that fermentation broths produced strictly in accordance with the Duggar and Niedercorn disclosures, using the deposited strain NRRL–2209, do not contain recoverable amounts of tetracycline. He stated that the absence of such amounts of tetracycline would have to be established by failure to recover this antibiotic in a clearly identifiable form according to present day efficient methods for the separation thereof from fermentation broths.

"While applicant's counsel did not concede that there is any necessity for such a showing, he ventured the opinion that it could be made and stated that he would explore the matter in view of the great urgency of this case. The Examiner made it clear that he would not insist on a categorical averment that the fermentation broths prepared according to the cited patents contain no tetracycline whatsoever. He evidently appreciates the impossibility of proving its non-existence and is not concerned about useless trace amounts which cannot be separated from the broths by methods now recommended for recovery of the new antibiotic."

The Niedercorn (aureomycin) patent contained forty-four examples of media. Lidoff asked Pfizer to run some tests on Example 28, which appeared to contain only a trace of chloride ion. The Commission found as a fact that "It is evident, however, that the examiner was interested in the possible production of tetracycline in any of the Niedercorn examples."

Pfizer thereupon conducted tests to determine whether tetracycline could be recovered from Duggar and Niedercorn Example 28 broths, using the three recovery procedures described in the Bogert-Walsh, Minieri and Heinemann applications.

Pfizer submitted affidavits to Examiner Lidoff, executed by two of its scientists, Bogert and Tanner, reporting unsuccessful efforts to recover products clearly identifiable as tetracycline from the Example 28 fermentation broths. After examining these affidavits, Mr. Lidoff requested more information as to the possibility of recovering tetracycline. The next day, December 9, Pfizer representatives conferred again with Mr. Lidoff and submitted a supplemental affidavit signed by Bogert, in which the following conclusion was expressed:

"Based on these results and on his experience with the results of a great many such tests on materials containing tetracycline, chlortetracycline and mixtures thereof, he is convinced that not nearly as much as 20% of the potency of the amorphous material could be due to the presence of tetracycline, in fact there was no indication whatever of the presence of tetracycline. Assuming that the maximum possible proportion of the total potency due to tetracycline is 10%, this means that the 0.36 grams of amorphous material cannot contain more than about 0.009 grams of tetracycline. He does not know of any method whereby any part

of such a minute amount of tetracycline could be separated and recovered in clearly identifiable form from the amorphous material."

Cyanamid representatives had told Examiner Lidoff earlier that, outside of experiments in fermenting tetracycline directly, Cyanamid had no knowledge that there had even been any coproduction of tetracycline in broths which were intended to produce aureomycin. The Commission found that Cyanamid discovered later, and prior to the issuance of the tetracycline patent, that there had been coproduction of tetracycline in aureomycin broths, but failed to disclose this fact to Examiner Lidoff.

On December 9, 1954, after receiving the Pfizer tests and affidavits, including Bogert's supplemental affidavit filed the previous day, Examiner Lidoff granted a notice of allowance to Pfizer. Under Patent Office procedure, a patent normally issues within a month after the notice of allowance.

On January 3, 1955, six days before the tetracycline patent was issued to Pfizer, Bristol filed with the Patent Office an affidavit disclosing in detail the fact of the presence of from two per cent to four per cent tetracycline in old aureomycin. Nevertheless the patent was issued to Pfizer on January 9.

Fundamental to the Commission's findings of improper conduct on the part of Pfizer and Cyanamid is the question of to what extent previous coproduction of tetracycline in aureomycin broths was material to the issuance of the patent. This involves numerous questions concerning the actions and purposes of Examiner Lidoff as representative of the Patent Office, the answers to which are so uncertain that the Commission reached conclusions directly contrary to the findings of its hearing examiner, based upon the same evidence.

There are numerous instances of sharp disagreement between the Commission and its hearing examiner as to findings of fact relating to the actions and purposes of Examiner Lidoff, examples of which are set forth in Appendix G.

Many material questions are not answered clearly by the evidence in the record before us, such as:

To what extent was Examiner Lidoff aware of inherent coproduction of tetracycline in aureomycin broths and in the finished product?

Was he concerned only about coproduction in aureomycin as a finished product, or was his inquiry also directed to coproduction in aureomycin fermentation broths?

Was the hearing examiner correct or incorrect in his finding that if Lidoff had known that old aureomycin contained from two to five per cent of tetracycline, he nevertheless would have granted the patent?

Did Lidoff consider any amount of coproduction under ten per cent to be immaterial?

Why did Lidoff request tests by Pfizer of Niedercorn Example 28, rather than requesting tests of others of the forty-four Niedercorn examples, at least one of which (Example 1) the Commission found would have disclosed five per cent coproduction?

Was Lidoff interested in establishing only that the prior art processes did or did not produce tetracycline in "appreciable" amounts, making possible its prior recovery as a therapeutic product? Was this his purpose in setting up the test of Example 28? If so, what did he consider to be an "appreciable amount" of tetracycline?

Was the hearing examiner correct in his conclusion that Lidoff knew "for more than a year prior to the decision on the second interference that fermentation broths produced under Duggar and Niedercorn usually contained tetracycline," or was the Commission correct in its conclusion to the contrary?

Did Lidoff draw a distinction as to the significance of coproduction as between product and process applications, as found by the hearing examiner, or was the Commission correct in reaching its contrary conclusion?

Did Lidoff see the "Taylor affidavit" filed by Bristol January 3, 1955, six days before the patent was issued? If so, what significance did he attach to its contents?

Would Lidoff's decision to grant the patent have been different if Cyanamid had revealed that it was in error in its prior assurances that there was no co-production of tetracycline in aureomycin? Or was he already aware of the facts which the Commission found to have been withheld by Cyanamid?

Finally, the ultimate questions are: Did Lidoff receive all the information that he requested from Pfizer? And was Lidoff mislead and deceived by Pfizer and Cyanamid and did he grant the tetracycline patent as the result of such deception?

It would seem that the answers by Examiner Lidoff to these questions might settle conclusively the issue as to whether Pfizer and Cyanamid made misrepresentations to the Patent Office and withheld essential information, thereby deceiving Lidoff into granting a patent which otherwise never would have been approved.

Only Examiner Lidoff could have answered these questions. Yet the Commission failed to call him as a witness, although requested by petitioners to do so during the hearings. Instead the Commission introduced as a witness Mr. Manuel C. Rosa, Lidoff's superior in the Patent Office, who obviously could not answer questions concerning matters which were exclusively within the personal knowledge of Examiner Lidoff. Petitioners did not seek to subpoena Examiner Lidoff to testify as their witness, having been denied an opportunity to interview him in advance.

It is said that it would be against the policy of the Patent Office to have permitted Lidoff to testify as a witness in these proceedings.

The Patent Office Manuel of Patent Examining Procedure, § 1701, provides as follows:

"1701 Examiners Not To Express Opinion on Validity Nor Testify as Patent Experts

"Inasmuch as public policy does not not permit Examiners to decide, as judges in the Patent Office, questions upon which they have been retained to give opinions as expert witnesses in patent cases in the courts, every Examiner who shall testify as an expert in a patent case pending in any court will be dismissed, unless he shall have so testified involuntarily, upon compulsion by competent judicial authority, and without retainer or preparation. (Basis: Notice of March 6, 1880.)

"Congress, in 35 U.S.C. 282, has endowed every patent granted by the Patent Office with a presumption of validity. Public policy demands that every employee of this Office refrain from expressing to any interested person any opinion or view as to the invalidity of any U.S. Patent. The question of validity or invalidity is exclusively a matter for the courts to determine. Each member of the examining corps is cautioned to be especially wary of any inquiry from any person outside the Patent Office (including any employee of another government agency), the answer to which might indicate that a particular patent should not have been issued.

"Whenever an examiner is asked or subpoenaed to testify in a suit concerning a patent, trademark registration, or application for either, he is directed to report that fact *immediately* to the Solicitor. (Basis: Notice, May 4, 1959.)

"Examiners are cautioned against answering inquiries from any person outside the Patent Office as to whether or not a certain reference was considered and, *a fortiori*, whether or not a claim would have been allowed over that reference. This applies to anything in the patented file, including the extent of the field of search and

any entry relating thereto. The record of a patented file must speak for itself. Practitioners can be of material assistance in this regard by refraining from making such inquiries of members of the examining staff. Answers to inquiries of this nature must of necessity be refused, and such refusal should be considered neither discourteous nor an expression of opinion as to validity. (Basis: Notices of May 18, 1961 and October 21, 1960.)

"Also, Examiners are reminded that, in view of the long established policy of the Patent Office to refuse to permit members of the staff of the Patent Office to testify in patent suits, they should, before allowing an application, determine that the written record is accurate and complete."

We see no reason why Examiner Lidoff could not have been subpoenaed as a witness to testify as to facts known only to him with respect to material issues of great public interest in this proceeding.

With no testimony available from Mr. Lidoff, the hearing examiner and Commission drew opposite inferences and reached opposite conclusions as to what this patent examiner knew, intended, and required in the processing of the patent applications. We find the decision of the Commission on this issue to be based upon inferences and speculation which are insufficient to constitute substantial evidence. See Universal Camera Corp. v. N. L. R. B., supra, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660.

 Accordingly we hold that paragraphs three through eight of the final order of the Commission, and its decision to the effect that the tetracycline patent was issued as a result of improper conduct on the part of Pfizer and Cyanamid, are not supported by substantial evidence on the record considered as a whole.

This opinion is not to be construed as an approval by this Court of the initial decision of the hearing examiner.

The entire proceeding is remanded to the Commission for a de novo hearing on all issues without the participation of Chairman Dixon. Upon rehearing the Commission may consider any evidence previously taken and now on file and such additional evidence on any issue raised by the complaint as may be admissible and relevant to such issues. Any party shall be accorded the right to require the presence of any previously sworn witness for additional testimony either on direct or cross-examination.;

Vacated and remanded.

## APPENDIX A

### Pfizer's Affidavit in Support of Motion to Disqualify Chairman Dixon

UNITED STATES OF AMERICA

BEFORE

FEDERAL TRADE COMMISSION

[SAME TITLE]

STATE OF NEW YORK, )
 ) ss.:
COUNTY OF NEW YORK, )

JOHN E. F. WOOD, being duly sworn, deposes and says:

1. I am a member of the firm of Dewey, Ballantine, Bushby, Palmer & Wood, attorneys for the respondent Chas. Pfizer & Co., Inc. This affidavit is submitted in support of the motion of said respondent that the Honorable Paul Rand Dixon, Chairman of the Federal Trade Commission, be disqualified from participating in the hearing or determination of the appeal of counsel supporting the complaint from the Initial Decision herein or in other action of the Commission in this proceeding. This affidavit is based on the record of "Hearings before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United

States Senate, on Administered Prices in the Drug Industry", 86th Cong., 1st and 2nd Sess., vols. 14–26 (1959–60), and S. Rep. No. 448, 87th Cong., 1st Sess. (1961).

2. From February 1957 until he became Chairman of the Commission on or about March 16, 1961, Mr. Dixon served as Counsel and Staff Director of the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary of the United States Senate.

3. In 1959 and 1960 the Subcommittee conducted an investigation into the manufacture, pricing and sale of the broad spectrum antibiotics which are the subject of this proceeding, and of other ethical drugs. In the course of the investigation the Subcommittee requested and received documents and information from the respondents and others relating to many aspects of the manufacture, distribution and sale of broad spectrum antibiotics, including pricing, bulk sales and purchases, requests for bulk supplies, patents, patent licenses, requests for such licenses, and patent interference settlements. Some of the material thus received by the Subcommittee is a part of the record in this proceeding; a part of such material, however, is not in the record of this proceeding although it relates to matters at issue herein. Mr. Dixon was in charge of the investigating activities of the Subcommittee staff, including those relating to broad spectrum antibiotics.

4. In September 1960 the Subcommittee held a number of hearings relating primarily to broad spectrum antibiotics. The testimony was quite extensive, the transcript consisting of almost 4,000 pages. Mr. Dixon participated actively in these hearings, examined many of the witnesses and introduced a large number of exhibits. The hearings were in effect an adversary proceeding in which some witnesses adverse to the ethical drug industry were called to testify, and some representatives of the industry, including representatives of the respondents, were subjected to questioning in the nature of cross-examination.

5. During these hearings some of the very transactions and issues involved in this proceeding, which are now to be considered by the Commission on the appeal from the Initial Decision, were the subject of extensive testimony and documentary evidence. Thus, the hearings dealt at some length with respondents' prices to wholesalers, retailers and institutions (Hearings, pp. 13,657–72, 13,729–39); respondents' bids and sales to the Military Medical Supply Agency (Hearings, pp. 13,687–94, 13,702–04, 13,715–19, 13,779–82, 13,790–92, 13,800–04); the interference settlement entered into between Pfizer and Cyanamid on January 11, 1954 (Hearings, pp. 13,694–702); and the infringement litigation, including the settlement thereof, between Pfizer on the one hand and Bristol, Squibb and Upjohn on the other (Hearings, pp. 13,905–06, 13,910–15).

6. During these hearings, on issues which are involved in the present proceeding, Mr. Dixon advocated positions which are inconsistent with the findings and conclusions of the Hearing Examiner which are now to be reviewed by the Commission.

(a) After a detailed review of the respondents' bids and prices to the Military Medical Supply Agency (MMSA) and other federal agencies, the Hearing Examiner found that "The record demonstrates price competition in the Federal market." (Initial Decision, p. 168). On the other hand, the line of Mr. Dixon's questioning of representatives of the respondents and other witnesses on this subject was apparently based on the contrary view (Hearings, pp. 13,687–94).

(b) After reviewing all the evidence, the Hearing Examiner rejected as "without merit" the contention of counsel supporting the complaint that the respondents had agreed upon a division of the MMSA market (Initial Decision, pp. 166–67). Mr. Dixon, on the other hand, in the presentation of evidence on this subject before the Subcommittee, referred to facts upon which counsel supporting the complaint

had relied and characterized them as an "unusual occurrence" which called for explanation (Hearings, pp. 13,702–04).

(c) The Hearing Examiner has found that there were good and non-conspiratorial business reasons for different prices to the MMSA and the Veterans Administration (Initial Decision, pp. 164–65). Mr. Dixon's questioning on this subject before the Subcommittee, however, suggested the view that the differences between the prices quoted to the two agencies were a cause for suspicion (Hearings, pp. 13,716–19).

(d) One of the subjects considered in detail by the Hearing Examiner was the interference settlement between Pfizer and Cyanamid. He found that the parties were actuated by sound and legitimate business reasons, that Pfizer was entitled to the concession of priority which it received and that there was no basis in the evidence or in logic for inferring that Cyanamid was seeking to help Pfizer obtain the patent (Initial Decision, pp. 24–26, 121–22). Mr. Dixon's questioning on this subject before the Subcommittee, however, indicated a considerably less favorable view of the interference settlement (Hearings, pp. 13,695–98).

(e) Although counsel supporting the complaint had sought to show that there was an agreement restricting Bristol's sales of bulk tetracycline to Squibb and Upjohn, the Hearing Examiner found to the contrary and specifically found that "Bristol's license [from Pfizer] contained no restrictions on bulk sales and authorized it to sell to whomever and wherever it wanted without restriction" (Initial Decision, p. 77). At the hearings before the Subcommittee, however, when a witness testified to the same effect, Mr. Dixon produced a document which is in evidence in this proceeding and which he contended was inconsistent with the statement of the witness (Hearings, pp. 13,913–14).

7. On May 8, 1961, Senator Kefauver transmitted to the Chairman of the Committee on the Judiciary a report of the Subcommittee on Antitrust and Monopoly entitled "A Study of Administered Prices in the Drug Industry" (S. Rep. No. 448, 87th Cong., 1st Sess. (1961)). His transmittal letter stated:

"I want to acknowledge with appreciation the efforts of Paul Rand Dixon, formerly counsel and staff director, and Dr. John M. Blair, chief economist, both in the work of the hearings on which this report is based and in the assistance they rendered the committee in the preparation of this report."

8. The Report contained a number of legal and factual conclusions concerning issues in this proceeding, some of which are inconsistent with the findings and conclusions of the Hearing Examiner which are now to be reviewed by the Commission.

(a) The Report (at pages 89–92) discusses at some length the respondents' bids to the MMSA. The Report adopts the conclusions suggested during Mr. Dixon's presentation of evidence (see par. 6(a) above). It refers to certain price fluctuations as "strange price behavior" and specifically quotes critical remarks made by Mr. Dixon with respect to this price behavior. It refers to the claimed division of the MMSA market as "another 'astounding' coincidence".

(b) The Report (at pages 145–47, under the heading "Oligopoly") surveys the interference settlement between Pfizer and Cyanamid, the subsequent proceedings in the Patent Office, the litigation and settlement between Cyanamid and Bristol, and the litigation and settlement between Pfizer on the one hand and Bristol, Upjohn and Squibb on the other. These matters were considered in great detail by the Hearing Examiner and, as to each of them, the Initial Decision is to the effect that the parties acted properly and lawfully. The tenor of the Report is different. It presents these matters as questionable both in their motivation and their effect.

9. Another expression of opinion on matters which are in issue in this case was contained in a letter dated July 19, 1960 which was sent to Honorable Earl W. Kintner, then Chairman of the Federal Trade Commission, over the signature of Honorable Estes Kefauver, Chairman of the Subcommittee (Hearings, p. 15,831). This letter, it is submitted, may be taken as reflecting the views not only of Senator Kefauver but also of the staff members, including Mr. Dixon, who worked so closely with him. The letter, after complimenting counsel supporting the complaint "for having done such an excellent job", proceeded to an appraisal of their proposed findings and conclusions in this case in the following terms:

" * * * It appears to be firmly based upon a large body of persuasive evidence; the issues involved are presented understandably; and the whole document is written clearly and to the point."

The view that the presentation of counsel supporting the complaint "appears to be firmly based upon a large body of persuasive evidence" is directly contrary to the conclusion of the Hearing Examiner, which is now to be reviewed by the Commission, to the following effect:

" * * * The decision must be based upon reliable, probative and substantial evidence upon consideration of the whole record. By such standards, counsel supporting the complaint have not sustained their burden of proof. Based upon a consideration of all the reliable, probative and substantial evidence in the record, it is concluded and found that the respondents have not engaged in any of the violations alleged in the complaint." (Initial Decision, p. 194.)

10. On the facts set forth above it is respectfully submitted that Mr. Dixon, as Counsel and Staff Director of the Subcommittee, has participated in investigations of and hearings upon matters which are in issue in this case and has advocated positions inconsistent with the Initial Decision which is now to be reviewed by the Commission.

JOHN E. F. WOOD

Sworn to before me this
12th day of December, 1961:

ROBERT W. ALBERTS
Notary Public

ROBERT W. ALBERTS
Notary Public, State of New York
No. 60-0033725
Qualified in Westchester County
Certificate filed with N. Y. Co. Clerk
Term Expires March 30, 1963

## APPENDIX B

**Letter Written by Senator Estes Kefauver to the Chairman of the Federal Trade Commission dated July 19, 1960.**

"The Honorable Earl W. Kintner
Chairman
Federal Trade Commission.
Washington 25, D.C.

Dear Chairman Kintner:

I have read with great interest the *Proposed Findings of Fact and Conclusions of Fact and Law,* Docket 7211, in the matter of American Cyanamid *et al.,* involving the antibiotic, tetracycline. I wish to take this opportunity to compliment the Commission, and particularly Mr. Goodhope and the other staff members who prepared the document, for having done such an excellent job. It appears to be firmly based upon a large body of persuasive evidence; the issues involved are presented understandably; and the whole document is written clearly and to the point.

There is, however, one aspect of the matter which troubles me. I am referring to decisions by the hearing examiner to keep *in camera* economic information on market shares, percentage markups, costs and profits of the respondents. (Cf. Proposed Findings 67, 68, 69, 99, 100, 101)

If the hearing examiner's decisions are allowed to stand, a dangerous precedent would be established under which the Congress, scholars and the public generally would be denied knowledge of the

bases on which much of the enforcement of Section 7 will turn. In this connection I cannot help but note that the court did not feel it incumbent to keep *in camera* information on market shares in the proposed Bethlehem-Youngstown merger. Nor has the Commission in its enforcement of Section 7 felt itself so obligated. As to the cost data, the courts and the Commission have long records of making such information available where relevant to the issues involved in the litigation, as is certainly the case here. In this connection may I call attention to the importance played by cost data in the *Aluminum* case. This decision was specifically cited in the legislative history as one which Congress intended the amended Section 7 'to go beyond.' It would seem anomalous for the Government to have included data in the public record in a Sherman Act proceeding but not to be able to do so in a proceeding under a newer and broader statute.

For these and related consideration, I am confident that ultimately the Commission will reverse the hearing examiner's decisions which, the record indicates, were strongly objected to by the Commission's trial counsel.

But here a problem of timing arises. The Senate Subcommittee on Antitrust and Monopoly plans to resume its inquiry into the drug industry with hearings on antibiotics in late September or early October. In view of the amount of time granted by the hearing examiner to counsel for the respondents it is most unlikely that the matter of the hearing examiner's decision on the *in camera* issue would reach the Commission in the regular course of events for decision until well after our Subcommittee hearings have been completed.

Under these circumstances I am hereby requesting the Commission under Section 1.134 of its *Rules of Practice, Procedure and Organization* to make available to the Subcommittee for the purpose of inspection, copying and use, the material in the proposed findings referred to above, in furtherance of the Subcommittee's inquiry into the drug industry.

In view of the pressure of time, your early consideration of this matter would be greatly appreciated.

Sincerely yours,
Estes Kefauver,
Chairman"

## APPENDIX C

**Commission's Interlocutory Order of December 20, 1961, Denying Motions to Disqualify Chairman Dixon.**

(Reported at 59 Federal Trade Commission Decisions 1488)

UNITED STATES OF AMERICA
BEFORE

## FEDERAL TRADE COMMISSION

COMMISSIONERS:

Paul Rand Dixon, Chairman
Sigurd Anderson
William C. Kern
Philip Elman
Everette MacIntyre

---

### [SAME TITLE]

---

All of the respondents in this proceeding have individually presented motions requesting the Commission to disqualify Commissioner Dixon from participating in the appeal from the Initial Decision of the hearing examiner. These motions filed under Section 7(a) of the Administrative Procedure Act, 5 U.S.C. § 1006(a), are based on an alleged prejudgment of the issues of fact and law to be presented in the appeal.

Section 7(a) of the Administrative Procedure Act clearly empowers the Commission to determine whether a presiding officer conducting a "hearing" on behalf of the Commission is subject to "personal bias or disqualification." It is less clear that it was meant to apply to participation of individual agency members in final or appellate determinations. The inquiry called for by a motion for disqualification is necessarily subjective in nature. It is extremely difficult and

delicate for a tribunal to assume the responsibility of weighing, objectively, the ability of one of its own members to make an objective judgment in a case. Further, the existence of such a power to disqualify carries with it an inherent danger of abuse, as a potential instrument for suppression of dissent.

Under the Commission's practice, disqualification is treated as a matter primarily for determination by the individual member concerned, resting within the exercise of his sound and responsible discretion. The Commission believes this practice to be proper and consistent with the law. In the instant proceeding no basis for departing from the normal practice has been shown.

IT IS ORDERED, therefore, that respondents' motions be, and they hereby are, denied.

By the Commission, Commissioner Dixon not participating.

> Joseph W. Shea,
> Secretary.

ISSUED: December 20, 1961

### APPENDIX D

**Memorandum of Chairman Dixon in Regard to Motions that He Be Disqualified.**

(Reported at 60 Federal Trade Commission Decision 1881.)

UNITED STATES OF AMERICA
BEFORE
FEDERAL TRADE COMMISSION

———

[SAME TITLE]

———

By separate motions supported by affidavits the respondents herein have requested that I be disqualified from participating in this proceeding. All of the motions were filed pursuant to Section 7(a) of the Administrative Procedure Act and allege in substance that my prior position and duties as Counsel and Staff Director of the Antitrust and Monopoly Subcommittee of the Committee on the Judiciary of the United States Senate disqualify me from further participation in this matter.

As the motions disclose, the Subcommittee for which I acted as Counsel and Staff Director did, during 1959 and 1960, conduct an investigation, including public hearings, into certain pricing and other practices of the ethical drug industry. As leading members of that industry, the respondents herein were requested to, and did, furnish documents and other information to the Subcommittee. As counsel, I played an active role in the accumulation and presentation of this factual data to the members of the Subcommittee.

While the motions inaccurately describe the role I played in the aforesaid investigation as "advocacy," it should be unnecessary for me to point out that hearings before Congressional committees are *ex parte* and in no sense adversary in nature. Further, they cannot be said to be adjudicative, since they have as their sole purpose the amassing of facts in order that the Congress may be adequately informed concerning the desirability or need for legislation. The entire extent of my participation in the Subcommittee's investigation of the ethical drug industry is a matter of public record. I stand on that record but, of course, do not consider myself bound by the writings or statements of others who participated in that investigation, including Subcommittee members or employees.

My duties with the Subcommittee staff definitely did not involve the making of decisions or judgments on the facts accumulated. It was my duty to assist in adducing all of the facts with respect to the subject being investigated and to refrain from presenting only one side of controversial subjects.

Respondents' motions refer to the phrasing of questions which I directed to witnesses during public hearings before the Subcommittee as indicating my advocacy of positions opposed to those of the respondents herein. It is elementary that the questions of a lawyer engaged in eliciting facts from a witness do not necessarily indicate his state of mind

but are couched in terms best calculated to adduce the truth.

The points raised by the respondents against my participation in this proceeding are not unlike the charge of bias raised against the complete membership of the Commission in the case of Federal Trade Commission v. Cement Institute, et al., 333 U.S. 683, 68 S.Ct. 793, 92 L. Ed. 1010 (1948). In that case, after the taking of testimony had been concluded and while the proceeding was still pending before the Commission, one of the repondents asked the Commission to disqualify itself from passing upon the issues involved, alleging that the Commission had previously prejudged the issues and was prejudiced and biased against the Portland cement industry generally. The Commission refused to disqualify itself, and the contention was subsequently presented to and rejected by both the Circuit Court of Appeals for the Seventh Circuit and the Supreme Court. Because the situation there dealt with is so analogous to the situation in which I now find myself and because the Supreme Court's consideration of this point is so clear and so complete, I quote from that opinion (pp. 700–702, 68 S.Ct. p. 804, supra):

"Marquette introduced numerous exhibits intended to support its charges. In the main these exhibits were copies of the Commission's reports made to Congress or to the President, as required by § 6 of the Trade Commission Act. 15 U.S.C. § 46, 15 U.S. C.A. § 46. These reports, as well as the testimony given by members of the Commission before congressional committees, make it clear that long before the filing of this complaint the members of the Commission at that time, or at least some of them, were of the opinion that the operation of the multiple basing point system as they had studied it was the equivalent of a price fixing restraint of trade in violation of the Sherman Act. We therefore decide this contention, as did the Circuit Court of Appeals, on the assumption that such an opinion had been formed by the entire membership of the Commission as a result of its prior official investigations. But we also agree with that court's holding that this belief did not disqualify the Commission.

"In the first place, the fact that the Commission had entertained such views as the result of its prior *ex parte* investigations did not necessarily mean that the minds of its members were irrevocably closed on the subject of the respondents' basing point practices. Here, in contrast to the Commission's investigations, members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities.

"Moreover, Marquette's position, if sustained, would to a large extend [*sic*] defeat the congressional purposes which prompted passage of the Trade Commission Act. Had the entire membership of the Commission disqualified in the proceedings against the respondents, this complaint could not have been acted upon by the Commission or by any other government agency. Congress has provided for no such contingency. It has not directed that the Commission disqualify itself under any circumstances has not provided for substitute commissioners should any of its members disqualify, and has not authorized any other government agency to hold hearings, make findings, and issue cease and desist orders in proceedings against unfair trade practices. Yet if Marquette is right, the Commission, by making studies and filing reports in obedience to congressional command, completely immunized the practices investigated, even though they are 'unfair,' from any cease and desist order by the Com-

mission or any other governmental agency.

"There is no warrant in the Act for reaching a conclusion which would thus frustrate its purposes. If the Commission's opinions expressed in congressionally required reports would bar its members from acting in unfair trade proceedings, it would appear that opinions expressed in the first basing point unfair trade proceeding would similarly disqualify them from ever passing on another. See Morgan v. United States, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429. Thus experience acquired from their work as commissioners would be a handicap instead of an advantage. Such was not the intendment of Congress. For Congress acted on a committee report stating: 'It is manifestly desirable that the terms of the commissioners shall be long enough to give them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience.' Report of Committee on Interstate Commerce, No. 597, June 13, 1914, 63d Cong., 2d Sess. 10–11.

"Marquette also seems to argue that it was a denial of due process for the Commission to act in these proceedings after having expressed the view that industry-wide use of the basing point system was illegal. A number of cases are cited as giving support to this contention. Tumey v. [State of] Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243, is among them. But it provides no support for the contention. In that case Tumey had been convicted of a criminal offense, fined, and committed to jail by a judge who had a direct, personal, substantial, pecuniary interest in reaching his conclusion to convict. A criminal conviction by such a tribunal was held to violate procedural due process. But the Court there pointed out that most matters relating to judicial disqualification did not rise to a constitutional level. Id. at 523, of 273 U.S., at page 441 of 47 S. Ct., 71 L.Ed. 749, 50 A.L.R. 1243.

"Neither the Tumey decision nor any other decision of this Court would require us to hold that it would be a violation of procedural due process for a judge to sit in a case after he had expressed an opinion as to whether certain types of conduct were prohibited by law. In fact, judges frequently try the same case more than once and decide identical issues each time, although these issues involve questions both of law and fact. Certainly, the Federal Trade Commission cannot possibly be under stronger constitutional compulsions in this respect than a court.

"The Commission properly refused to disqualify itself. We thus need not review the additional holding of the Circuit Court of Appeals that Marquette's objection on the ground of the alleged bias of the Commission was filed too late in the proceedings before that agency to warrant consideration."

Should I accede to the respondents' motions here, I might also find myself barred from consideration of cases in other industries investigated while I served as Counsel and Staff Director to the Senate Antitrust and Monopoly Subcommittee of the Committee on the Judiciary. These industries include, among others, the steel automobile, milk, bread and roofing industries. I would thus find myself in the position where by experience acquired from working as a legislative counsel would be a handicap instead of an advantage. This, in my opinion, would defeat the very intendment of Congress in creating a Commission to be manned by commissioners with some degree of expertise.

Following the respondents' contentions to their ultimate conclusion, the Commission itself might be alleged to be disqualified from ultimately judging a proceeding because of the fact that under its basic responsibilities, it reviews, prior to the issuance of a complaint, investigational records. Such investigational records are not unlike investigative records of legislative bodies. They are both *ex parte*. However, after the issuance

of a complaint by the Commission and the joinder of issues, it is clear that the proceedings then become adversary and the record must be finally judged in this climate. I find myself in a position not greatly different from that of my fellow Commissioners.

The respondents' motions are founded upon the assumption that I have pre-judged the issues here involved, and I am incapable of rendering an impartial decision. Thus, what is here involved is the present state of my mind with respect to these issues. The state of a man's mind is by the nature of things known only to him and to his Maker. I have carefully and conscientiously considered the question here presented and have concluded, and hereby state, that I have not formed a definite opinion with respect to any of the material issues involved in this proceeding and honestly believe that I have a free and open mind with respect thereto, and I am fully capable of rendering a completely impartial decision based solely upon the facts contained in the record. Accordingly, I shall not withdraw from participation in this proceeding.

In view of the nature of these motions, I am not participating in the Commission's deliberations and decision upon them.

PAUL R. DIXON
PAUL R. DIXON
Chairman.

FILED: February 1, 1962.

## APPENDIX E

Excerpt from hearings before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United States Senate, on Administered Prices in the Drug Industry, 86th Congress, 1st and 2nd Sessions, Vol. 24 (1959–1960), in which Mr. Paul Rand Dixon participated as Chief Counsel and Staff Director.

Dr. Blair. May I, Mr. Chairman, make a point which will only take a second? Dr. Malcolm brought up the point of the increase in the cost of labor and the increase in the cost of equipment. All I want to observe is that undoubtedly those increased costs of labor and equipment were also applicable to both streptomycin and penicillin.

Dr. Malcolm. I would like, since you revived the subject, to say that the entire industry would go bankrupt if we attempted to sell the broad spectrum drugs at penicillin prices.

Mr. Dixon. You mean that if you were to be competitive, you would go bankrupt?

Dr. Malcolm. Many people did go bankrupt.

Mr. Dixon. Are you against competition?

Dr. Malcolm. No, sir. I think we have the highest form of competition.

\* \* \* \* \* \*

Mr. Dixon. Mr. Chairman, before you go to the next table, in your statement in the first paragraph, Mr. Duncan, you said, when you were tracing the price reduction down to 1951:

The price had declined to a point where it was well within the reach even of the needy.

I recall the statement by Dr. Malcolm, in tracing how quickly people get well today as compared to yesterday, that usually when this drug was prescribed, it has been from $8.50 to $17. For anybody who has had this experience —and I do not think there is anybody in this room who has not had to have an antibiotic prescribed for himself, or a member of his family—do you think a cost of $17 to the average mother and father every time their child has a bad cold is down to a point where it can be reached even by the needy?

Mr. Duncan. First of all, as Dr. Malcolm has pointed out—I have raised a family of four children so I can speak with authority—you normally do not encounter resistant organisms. In my case, and I have had a number of cases, you have one course of antibiotics which is $8. Now I consider with all the other expenses that are involved in raising a family, $8 is not a particularly large sum

to spend on something of this kind, and the typical experience is unless you are particularly unfortunate that you need antibiotics about once or twice in your entire lifetime. You are talking about— it is not as much as the cost of a pair of shoes, you know.

Mr. Dixon. Mr. Duncan, I do not mean to dispute you. But I have two children; one is 10 and the other 13. They have on the average of two or three colds a year, and every time they have a bad cold, they get a prescription for antibiotics, and it is always refilled. I think I am not much different from the average person; my children are pretty healthy. We receive thousands of letters that do not agree with what you say.

* * * * * *

Senator Kefauver. Mr. Dixon, will you proceed?

Mr. Dixon. Thank you, Mr. Chairman.

Dr. Malcolm, with respect to Aureomycin, you did sell this product, I believe to the Military Medical Supply Agency in the past; is that correct, sir?

Dr. Malcolm. That is correct, Mr. Dixon.

Mr. Dixon. We examined some of the exhibits that were received, and data that was obtained from MMSA and presented in the Federal Trade Commission case. Then we received data from MMSA to confirm it.

So taking a 250-milligram tablet in bottles of 100, we found, starting from 1951 down through 1959, your company selling Aureomycin, Parke, Davis, selling Chloromycetin, and Pfizer, selling Terramycin. In 1951 you sold to MMSA in the range between $18 and $15.30; Parke, Davis sold between the range of $20 and $15.30; and Pfizer sold between the range of $19.50 and $15.

In 1952, you sold to MMSA at $15; Parke, Davis, $15.30; Pfizer, $15.

In 1953, you sold at $15; Parke, Davis, at $12.50; and Pfizer, at $15; and so on, until, say, 1958, when you sold at $11; Parke, Davis, in the range of $12.50 and $11.25; and Pfizer, between the range of $10.97 and $10.75.

It is my understanding from talking to this agency that they bought these supplies on what they call negotiated bids; is that correct, sir?

Dr. Malcolm. I think that is correct.

Mr. Dixon. And from what I have pointed out to you, it is obvious that the price came down over that period of time.

Do you have any recollection of your company making any difference in a price quotation to this agency on a volume purchase?

Dr. Malcolm. Mr. Dixon, I am not qualified to answer your question on that because I do not have the facts. May I refer that, Mr. Chairman, to Mr. Duncan, who is general manager of the division?

Senator Kefauver. All right, very briefly, go ahead, Mr. Duncan.

Mr. Duncan. Yes.

Mr. Dixon, I think you will find generally—I don't have the figures in front of me—generally speaking, the MMSA, or Armed Services Procurement Agency, normally bought in very large quantities, you are correct.

They normally bought bottles of 100 or 250 milligrams in very large quantities. I believe the quantities normally ranged from 40,000 to 50,000 bottles and some of them ran as high as 75,000 or 80,000 bottles.

Mr. Dixon. I note that in 1956 your range to the Military Medical Supply Agency for Aureomycin, 250-milligram tablets, bottles of 100, was between $11 and $12.

Mr. Duncan. Yes; I believe it came from $12 down to $11.

Mr. Dixon. And at this same time your price to the druggist was $30.60.

Mr. Duncan. That is correct.

Mr. Dixon. When tetracycline came into the field and the Military Medical Supply Agency began to purchase this product—Mr. Chairman, I would like to ask that this exhibit be made exhibit 21 in the record.

Senator Kefauver. It will be made 21.

(Exhibit No. 21 follows:)

\* \* \* \* \* \*

Mr. Dixon. This reflects the purchases from negotiated bids made by the Military Medical Supply Agency from October 1956, through December 1959.

You will note in October 1956, on the quantity that was asked for, the total price of the purchase of 94,176 bottles was $1,035,936. The winning price was $11. This was the unit price of Lederle Laboratories. You will notice that Bristol Laboratories bid $18.97. Pfizer bid $19.58. Squibb bid $19.58, also.

This is an identical product that you bid on. All three were manufacturing and making it, isn't that correct, sir?

Mr. Duncan. That is right.

Mr. Dixon. If you will go down to the next bid, May 14, 1957, it was a $155,232 purchase, and it went to Charles Pfizer & Co. for $11, the unit price. On this quantity you bid $19.58, as Squibb bid $19.58. Why on this particular bid did you bid identically with Squibb?

Mr. Duncan. That was our published price, the Federal Government published price. The first time we bid was in October 1956, isn't that correct, $11? As I recall the circumstances, up to that time I think the buying had been entirely Aureomycin or Terramycin with some Chloromycetin, but the real competing products there were Aureomycin and Terramycin.

Now what happened was I was not fully aware of this, being a little new in the business, that the Army had never before bought tetracycline.

It was brought to my attention that they had an order for tetracycline. Well, I guess I did not give it a great deal of consideration.

That was just about the time that I was just looking at. This matter came up with the Federal Trade Commission, so I was trying to refresh my memory.

\* \* \* \* \* \*

Mr. Dixon. Looking at that document again, if you will, sir, you will note that you and Pfizer changed places. On the first bid you bid $11 and you were awarded the bid. The next time you raised your price and Pfizer lowered their price to $11.

Mr. Duncan. They obviously thought we were going bid $11 again or a little more than $11.

Mr. Dixon. I notice that $11 mistake never occurred after the first two times.

Mr. Duncan. I can't speak for Pfizer, but you will find from that time on we have a published Government price which we bid regularly.

We came to the conclusion on tetracycline at least that was a reasonable price for Army bidding and we would stick to that price, so any further bids you see are prices which you will find in our catalog.

Mr. Dixon. If you will run your eye on down—

Senator Kefauver. You wouldn't bid $11 unless you could make some money on it, would you?

Mr. Duncan. No, when we come down to $11, Senator, what you have to consider is that if you consider the regular costs which normally apply and should apply on a business of that type, you lose money at $11, and if you try to apply that kind of price for our total business, you will see we would quickly go bankrupt.

Mr. Dixon. If you will go down the list of various purchases, you said from that time on you started bidding $19.58. This appears to be true. But you will note, for instance, in February 1958 Pfizer was bidding $17.24. You will notice again in March of that year you bid $17.24. Upjohn, in January of 1958, had bid $14, but you were still bidding $19.58.

Why did you keep on bidding $19.58 as long as you had already found out that at least on a big order in June 1958, of $1,611,526, previous experience had shown that Pfizer was willing to bid $17.24? Pfizer bid $17.24 again and got the award. You kept your price at $19.58.

Mr. Duncan. We did not choose to meet that competition. We felt that we

just were not justified in doing it. We held to our published Federal Government price in 1958. Eventually we decided to come down and meet it and our current price is $17.60 less 2 percent or a net of $17.24.

Mr. Dixon. On the very next bid after that, September of 1958, for $361,000 and some odd cents, all of the companies bid $17.24 other than Bristol, which was rejected. How come you bid $17.24 on that one? Is that when you started meeting competition?

Mr. Duncan. We had simply decided at that time that we would move our Federal Government price down to that price, published it, and bid that figure.

Mr. Dixon. So the other companies had done the same thing because that was awarded by lot?

Mr. Duncan. I cannot really say. I do not really know what they did. I had no idea what they were going to bid but I decided I was not going to compete on that basis for the business. We would have a regular Government price that we would adhere to and which we have adhered to.

Mr. Dixon. I notice that they all bid $17.24. Nobody was at $17.23 or $17.25. You were all at $17.24. This was a change for you. Where did it come from so far as you were concerned?

Mr. Duncan. The previous bid. If you go back here, and that $17.24 had been bid by Pfizer as early as January of 1958. You see, after every one of these awards, we get all the bids by the various companies and we know what they are doing. That had been bid as early as January 14, 1958.

Mr. Dixon. So all you have to do is go to the bid opening and find out what the others bid and if one bid less than that before, if you want to be competitive, you just adopt that price, is that it?

Mr. Duncan. Not necessarily. You have to make up your mind as to what you want to do and I am sure the others may not be exactly in our position. As I say, the—

Mr. Dixon. If you really wanted the business, why didn't you bid $17.20?

Mr. Duncan. I had not the faintest idea, Mr. Dixon—it is very easy looking back, but in looking ahead, I had not the faintest idea. Actually, I was astounded that they bid $17.24. I expected someone to bid, with a different situation, to bid $15 or $16. I had no idea what those bids would be.

Mr. Dixon. You knew if Pfizer repeated for $17.24 and you bid $17.24, you would be matched. You knew that?

Mr. Duncan. Yes.

Mr. Dixon. And you would not get the order unless you drew it by lot, isn't that true?

Mr. Dixon. But if you really wanted it, you could have bid $17.20?

Mr. Duncan. Yes.

Mr. Dixon. Pfizer also bid $17.24.

Mr. Duncan. You are assuming a fact that was evident only after the bids were open. At that time my question was, Was it worth while trying to shade off a few pennies when the likelihood was one of our competitors would bid $2 under that figure or $3 under that figure?

If you go back to the bidding on aureomycin and terramycin, that is exactly what happened. We bid $1.50 or $2 under and then Pfizer bid $2 under and we bid $2 under and we got this price down to a ridiculous figure.

Mr. Dixon. If you will just move down to the next one on that list, you will find that Squibb came with a $17.15 bid. Obviously, Squibb wanted it because the rest of you bid $17.24.

Mr. Duncan. We were just bidding our published price. Why our competitors did not bid $1, $2, or $3 under that, I cannot explain. I know nothing about it.

Mr. Dixon. Are you saying this price that was originally $19.58 was published and then you published the $17.24 price, also?

Mr. Duncan. That is correct.

Mr. Dixon. Each time you changed it, you published it?

Mr. Duncan. I am sure that is correct. We were bidding our published price, because that has been our fixed policy since that time.

Mr. Dixon. What published price is this? Where do you publish a price? You are only going to sell to MMSA. Do you publish a price to them in advance?

Mr. Duncan. I am sure we do. It is a Federal Government price that I believe is published in our catalog, is it not?

Mr. Hesse. Yes, all Government agencies.

Mr. Duncan. It is general knowledge. There is no secret about it.

Senator Kefauver. If that is the case, there is not much use in the MMSA asking for bids, if you are all going to have the same price.

Mr. Duncan. The history has been that it has not been the same price. I cannot answer for the other companies. As far as I am concerned, we decided that this would be our policy, and what they bid was none of our concern.

Mr. Chumbris. May I ask a question at this point? For clarification of the record on the exhibit in front of us, I notice that the first two bids on the top of the page are listed as ADV, under "Method."

Mr. Dixon. That means advertised instead of negotiated. Advertised means secret bid.

\* \* \* \* \* \*

Mr. Dixon. From my recollection from the statements that have been made, reference was made to the fact that tetracycline was brought on the market and that your company had done a great deal of work on it. About the time you brought it out you found others were bringing out a similar or an identical product. I assume, Dr. Malcolm, that when you brought this product out, you made application for a patent; did you not?

Dr. Malcolm. Yes.

Mr. Dixon. Did I understand you to say you had made application?

Dr. Malcolm. Yes; we made application for both process and product patent.

Mr. Dixon. After you made application, you found others had made application; did you not?

Dr. Malcolm. That is true.

Mr. Dixon. How many of them made an application?

Dr. Malcolm. Well, it is a rather involved story.

Mr. Dixon. If you will just name them, that is all I want.

Dr. Malcolm. Well, there were about two applications. One was concerned with a product patent for tetracycline produced by the process of dechlorination. Another application was made which was concerned with a process or processes of producing tetracycline by fermentation, and being related to tetracycline hydrochloride. That was the second application.

Mr. Dixon. Because more than one application had been made, under the regular procedure at the Patent Bureau it was placed in an interference procedure, was it not?

Dr. Malcolm. That is correct, sir.

Mr. Dixon. Is it not true that this patent was ultimately issued to Pfizer?

Dr. Malcolm. That is correct.

Mr. Dixon. What kind of an arrangement did you make with Pfizer when you withdrew from this interference?

Dr. Malcolm. We made no arrangement. We drew up some cross licensing agreements between Aureomycin whereby we agreed to license them to manufacture Aureomycin for the purpose of manufacture tetracycline solely, and they, in turn, in the event they received a patent, whoever received the patents on tetracycline would cross license each other. However, Mr. Dixon, that is a matter that was gone into very thoroughly in Federal Trade Commission testimony.

Mr. Dixon. I don't mean to pursue it in depth, sir. I just want this background.

On the other hand, you had this interference on this important tetracycline product, and the interference was withdrawn and Pfizer obtained a patent. Wasn't that roughly about it?

Dr. Malcolm. No, the interference was not withdrawn. In the fall of 1953, I think it was, an interference was declared between Pfizer and ourselves for the production of tetracycline by the—

Mr. Dixon. Did your company withdraw from the interference?

Dr. Malcolm. We withdrew in this sense, and you must be very careful as to how you use the word "withdraw." It was agreed between Pfizer and ourselves that the evidence as to priority would be submitted to a third party, or to third parties, to determine which party was prior in terms of invention. These independent parties determined that Pfizer was the prior inventor, and so, therefore, we withdrew. In the event that there had been any difficulty, we proposed submitting these data to the Patent Office itself.

Mr. Dixon. But as I understand, that is the function of the Patent Office, so you just worked out an independent process.

Dr. Malcolm. No, no. Of course, I am not a patent attorney, but I think that the procedure that was followed is common procedure.

Mr. Dixon. The fact is that Pfizer received the patent, and by this arrangement you had entered into with them you became a licensee?

Dr. Malcolm. That is right. Pfizer ultimately got the patent both for product and process, and we became a licensee of Pfizer's for tetracycline under the tetracycline patent which they hold, and we in turn licensed them under our Duggar patents for the manufacture of Aureomycin for dechlorination in the production of tetracycline.

Mr. Dixon. The point I want established is that at the time the patent was awarded to Pfizer, there was no other application before the examiner to pass upon, was there?

Dr. Malcolm. Well, to the best of my knowledge there was no other application before the examiner at the time the patent was issued to them.

Mr. Dixon. This is my point.

\* \* \* \* \* \*

Senator Kefauver. You can say yes or no, whether that is a correct statement. You and Bristol had an application for the patent, along with Pfizer. By some arrangement or another, you got out anyway, you were out, and the same happened to Bristol. Then immediately afterward Pfizer licensed you and Bristol.

Dr. Malcolm. No, Mr. Chairman, that isn't so; and I can't answer your questions yes or no because they are highly involved questions. If you will permit me to proceed, perhaps I can explain it to you in a matter of 5 minutes.

Mr. Dixon. I thought you had previously told us, Dr. Malcolm, at the time before you went to arbitration—

Dr. Malcolm. Pardon me?

Mr. Dixon. I thought you had just told us before you went to arbitration that you worked out arrangements with Pfizer where you agreed to license—

Dr. Malcolm. There are two parts to the agreement. In the fall of 1953, Mr. McKeen, who is president of Pfizer, came to see me and asked if we were parties to the tetracycline interference, which dealt with the dechlorination process and the product patent itself.

I told him that we were, and he said that they were also in the interference. Now, this is the first declared interference. In this one there was just Pfizer and ourselves.

It is of interest as to why I think a settlement was reached and as to why Pfizer came to us. Going back to the fall or the spring of 1953, we were having difficulties with our Aureomycin, competitive difficulties in terms of the acceptance of it, due to what was claimed to be excessive side effects. So I had

asked our research people and developmental people to see if there was something they could do with regard to lessening these undesirable side effects.

We did a great deal of work on this when one day—again in early spring, is the time I am referring to—one of our research men came in and said that he had produced tetracycline by removing the chlorine from the Aureomycin molecule. We sent the tetracycline out; we performed a pharmacological and toxicity test and sent it out for clinical study, and we were very happy and pleased to learn that tetracycline had not only about the same bacteriological spectrum but it lacked these undesirable characteristics that had been associated with Aureomycin. Then we made patent application in the spring of 1953 under the name of Booth & Morton, I think it was, claiming the product and the process of dechlorination. Then later that fall, my associates, research associates, told me that an article had appeared in a journal, a chemical journal, a scientist by the name of Stevens, who was an employee of Pfizer, had postulated the structure of chlortetracycline and tetracycline. I remembered this at the time of my meeting with Mr. McKeen, and Mr. McKeen made it very evident that he felt that they had the dominating patent position in terms of the interference.

I tried to convince him that we had the dominating position. At the same time, I was somewhat concerned because of the Stevens article, which had postulated the structure of tetracycline, that they probably had priority.

Now, we in the meantime had put tetracycline on the market as a superior product. We had committed ourselves to it and we had actually passed the point of no return in terms of Aureomycin. Now, commercially, aside from the scientific facts, that is very important. That was very important to us, because Mr. McKeen had Terramycin, and if he obtained the patent, the product and process patent, he could stop us from manufacturing tetracycline, to which we had committed ourselves, but, of course, Mr. Mc-

Keen could not manufacture tetracycline without infringing our Duggar patents.

So under such circumstances, I could not afford to take the commercial risk which might endanger our entire market. As I recall having said, in the Federal Trade Commission, Mr. McKeen had me over a barrel, and I wanted to get off of that barrel.

So after giving it thorough consideration, I agreed with Mr. McKeen on two agreements. One, that we would license him under our Duggar patents for him to make Aureomycin for the sole purpose, and we would give him know-how to do it, but for the sole purpose of making tetracycline.

As a part of that agreement, Mr. McKeen insisted that we sell to him bulk tetracycline.

Now, certainly, it wasn't in our interest, after having introduced tetracycline and having done the original clinical work on it, to put Mr. McKeen in business. That certainly would have been most stupid on our part.

But he insisted upon this, that we do furnish him with bulk tetracycline. So I had to accede to that request.

So then the matter of the first interference came up insofar as priority is concerned, and the purpose of that, of course, was to determine who was the prior inventor. As we said earlier, we had these independent people who determined that priority belonged to Pfizer.

Mr. Dixon. Who were these individuals?

Dr. Malcolm. One of them was our counsel, Mr. Watson, I believe, who is a very distinguished patent man; Mr. Edelblute, who is a patent attorney for us.

\* \* \* \* \* \*

Senator Kefauver. You had agreed that Pfizer would license you, and you, in turn, would give them the Duggar license so they could make chlortetracycline, and that you would sell to them in bulk.

Dr. Malcolm. No, Mr. Chairman. Whoever was prior, that if we got the

patents—I still was hopeful. I didn't know who had priority in this, but I was hopeful that we would get the patents on the tetracycline process and product.

But whoever got it, the agreement was that we would license—cross-license each other on the basis of the commercial risk that was involved.

Senator Kefauver. This sounds like your attorney and Mr. McKeen's attorney getting together and making a decision.

Dr. Malcolm. That wouldn't represent good business sense, Mr. Chairman.

Senator Kefauver. It was an outside arbitration?

Dr. Malcolm. It wasn't an outside arbitration. This was done, as I understand it, by attorneys representing us and attorneys representing them.

Senator Kefauver. And your attorneys agreed that they had priority?

Dr. Malcolm. And our attorneys—I was notified by—

Senator Kefauver. I must say that is the most remarkable arbitration I have ever heard of.

Dr. Malcolm. No. Again, I am not a patent attorney but I am told that this is most common.

Mr. Dixon. The reason I asked you to digress and give us that background is because I want to refer you now to exhibit 21 which shows the purchases by the Military Medical Supply Agency from those producers of tetracycline. Tetracycline, I have been informed, is the largest selling item.

As I understand the development of tetracycline, Pfizer did ultimately obtain the patent. You and Bristol Laboratories were licensed to manufacture and sell tetracycline. I do not understand—

Dr. Malcolm. You mean by Pfizer?

Mr. Dixon. Sir?

Dr. Malcolm. By Pfizer?

Mr. Dixon. Yes, by Pfizer.

Dr. Malcolm. Yes.

Mr. Dixon. I understand that Squibb and Upjohn were licensed merely to sell and not manufacture tetracycline.

Dr. Malcolm. I don't really know. Of course, that would be no concern of ours. That would be a matter between—

Mr. Dixon. But you do know that there were, and are, five sellers of tetracycline?

Dr. Malcolm. That is correct.

Mr. Dixon. I have named all five of them.

Dr. Malcolm. Yes, that is true.

Mr. Dixon. Mr. Chairman, I have another table here which I would like to suggest be made exhibit No. 22.

Senator Kefauver. Does this have to do with this patent matter?

Mr. Dixon. It does, sir.

Senator Kefauver. All right, let it be made exhibit No. 22.

\* \* \* \* \* \*

Mr. Martin. Mr. Chairman, may I say something on this remark that was made some time ago that the settlement of the interference between Pfizer and Cyanamid was a very unusual procedure.

It is a very common procedure in interference proceedings not only in the drug field but in the chemical field, and I think if your staff will look at a good many of the documents that were submitted by us in answer to the subpena, that you will find a good many of them contain similar provisions as to settlements of interferences.

Senator Kefauver. The only thing that appeared unusual to me was that Dr. Malcolm was presenting the reasons why he had the prior and superior claims to the patent on tetracycline. Mr. McKeen was doing the same. And how the lawyer for Dr. Malcolm could get together with the lawyer for Mr. McKeen and both of them decide against Dr. Malcolm and Lederle—you call that an arbitration? I don't understand.

Mr. Martin. I don't call it an arbitration myself, Mr. Chairman, but it was a common way of settlement, and if there had been disagreement as to the facts—and this was a determination of a fact of priority of invention—provision was made in the agreement for submitting

the facts to the Patent Office for their determination.

Senator Kefauver. It looks to me as if the agreements for cross-licensing, whichever way it went, played an important part in pressing the case for a patent.

Mr. Martin. I don't follow that reasoning.

Senator Kefauver. In other words, Dr. Malcolm had already agreed with Mr. McKeen that Mr. McKeen would license him or he would license Pfizer, whichever way it went, but that if Pfizer received the patent, however Pfizer would insist on tetracycline being sold to them in bulk. Part of the agreement was that Lederle would license Pfizer to make chlortetracycline, so that the matter was arranged, it seems to me to protect both sides, whichever way the decision went.

Mr. Martin. There was one thing there that the agreement provided, the separate agreement:

That we would furnish the bulk whether we got the patent on tetracycline or whether he got it. It was not that we would sell him if he got the patent; and if we got the patent, we were to get a royalty from Pfizer; and we would very much have desired to get that royalty.

Senator Kefauver. Part of the agreement also was that you would get a royalty on chlortetracycline from them, whichever way it went?

Mr. Martin. We had that patent which was long in existence, and we had a royalty payable to us from Pfizer no matter which way the interference was decided.

Senator Kefauver. Have these agreements been made a part of the record of the Federal Trade Commission case?

Mr. Martin. Yes, sir; they have.

Senator Kefauver. We can make note of them.

Dr. Malcolm. This is one of the key issues.

Mr. Chairman, as you probably have discerned, Mr. Martin is trained as a lawyer. The legal department and patent department, among many other things,

report to him. I am not. But from a strictly business standpoint, Pfizer and ourselves were in a mutual blocking situation; and, if a settlement was not made, tetracycline could not have been made available to the public or sold at all so long as that situation continued to exist.

Senator Kefauver. The unfortunate thing about it is that there is quite a question whether tetracycline should have been patented in the first place. Unless you had agreed to let one side or the other have it, it might have been that the Patent Commissioner would have not issued a patent. In that case, small manufacturers could have made the product and competed.

Mr. Martin. That is quite a question that is before the Federal Trade Commission, and I think it is a little pressing us to go into the details of that any further, Mr. Chairman.

Senator Kefauver. I won't insist that you do, but I am just stating how it appears to me: by working out this agreement, you made it easy for a patent to issue and both of you got what you wanted; but this made more or less moot the question of whether a patent should issue at all or not.

It is possible the Patent Commissioner may have decided the matter the other way: that no patent should issue.

We have that situation right now in the case of prednisone, where there are several interferences, and it is quite possible that the Commissioner in that situation would decide that no patent should issue and all the little companies can then compete.

Mr. Martin. Under the patent system, Mr. Chairman, when we conceded priority because of the facts of—

Mr. Dixon. Arbitration?

Mr. Martin. No; no arbitration. It was not arbitration.

It was discussion between counsel of Pfizer and counsel of Cyanamid, to put the facts upon which they would rely in the Patent Office on the table, and our

counsel advised us that he had to concede priority because Pfizer was prior.

Our conceding priority in that interference immediately threw us out of the interference and we had no knowledge of any further prosecution of that patent, because after the interference was dissolved by the examiner, it became an ex parte proceeding again and we know nothing about what went on in the Patent Office between Pfizer and the Patent Office.

Senator Kefauver. It is a whole lot easier to get a patent issued when there is an ex parte proceeding—just one person—than it is when there is a contest as to whether it is patentable or not, and, if so, who should have the priority.

Mr. Martin. The contest in the priority proceeding, where there is an interference, is an assumption that the Patent Office has decided that the claims are patentable, but they wish to decide the priority between the two claimants, and that is what the interference is declared for.

Senator Kefauver. Dr. Malcolm, you never would have agreed to this kind of an arrangement about submitting it to counsel and letting them decide it unless you had had a firm commitment from Pfizer that they would license you in the event it was decided their way.

Dr. Malcolm. Mr. Martin is pointing out that the agreement was signed before we submitted it to counsel.

Senator Kefauver. But you never would have gone along with this procedure by which Pfizer won the patent unless they had previously agreed to license you.

Mr. Martin. There is a difference there. It is not whether the patent would issue. It was whether one party was prior to the other.

That was the question that we were settling, and we were settling that if one party was determined to be the junior party and therefore not entitled to priority, that party would concede priority to the other.

Senator Kefauver. This is a matter of semantics.

Mr. Martin. No, sir.

Senator Kefauver. Then let's restate it.

Dr. Malcolm, you never would have agreed to this method of deciding who had priority—that is, you would have gone on and fought the case through—except for the fact that you already had an agreement that Pfizer would license you and you were going to be taken care of?

Dr. Malcolm. No, the only reason I was interested in that agreement was, as I explained before, I was fearful that Pfizer had priority, which turned out to be true. And from a commercial standpoint, regardless of semantics or anything else, I did not dare take the risk of losing that position.

Senator Kefauver. That is the point I was making: If you had not had the agreement, you would have fought on because you did not dare take the risk of losing.

Dr. Malcolm. I could have fought on, but as the facts ultimately proved to be, I would have lost.

In the meantime, I would have been stopped from the manufacture of tetracycline and I also would have been subject to considerable royalty payment, I am sure of that.

Senator Kefauver. I think it should be pointed out that in this case and in other similar cases, one of the facts brought to the attention of the Patent Commissioner is whether a patent should be issued in the first place; that is, whether a product is patentable when you bring up new facts about it; whereas, when it is just and ex parte proceeding, then the opposing party is not there to bring out these facts to the attention of the Commission.

But, anyway, we have talked about this matter long enough. Let us proceed.

Mr. Dixon. Mr. Chairman, I call the witness' attention to the exhibit which you have just put in the record, exhibit

22. We asked the Military Medical Supply Agency to supply this information to us. You will note there that Agency's procurement of tetracycline in all forms between November 1956, and October 1959. On the top are listed the sellers: Pfizer, Lederle, Bristol, Squibb, Upjohn, then the total. You will notice in the left column the forms in which it was sold. You will note the percentages at the bottom. That is arrived at by adding these columns of purchases from each individual company. In this period of time on the total purchases of tetracycline from the five sellers, Pfizer was successful in 46.6 percent of the dollar value of the purchases; Lederle was successful in 17.8 percent of the dollar value; Bristol was successful in 17.6 percent of the dollar value; Squibb was successful in 17.5; and Upjohn, in only .5.

Three companies—Lederle, Bristol, and Squibb—have approximately 53 percent; Pfizer, 47 percent.

Do you have any explanation for that unusual occurrence?

Mr. Duncan. Mr. Dixon, could I ask why did you stop in October of 1959?

Mr. Dixon. Why did we stop in October 1959? The next purchases were, I believe, from the Italians.

Mr. Duncan. Mr. Dixon, the thing that occurs to me here, it is hard to comment on these things when they are put in front of you, and the thing that occurs to me, I can't say just when, but certainly it wasn't more than 6 months ago that our man who works in this particular field had managed to get a sirup, which is not listed here, on the list for purchase.

Now, I am sure that was a pretty substantial contract. We thought we had it, and for some reason the bid was thrown out and Squibb came in and took it on the rebid. That isn't in here, and I know that was a regular MMSA procurement.

And it was a big quantity, so it would make a difference.

Mr. Dixon. We asked them to give us—

Mr. Duncan. Mr. Dixon, there is another thing, too. Coming in here somewhere there are some rotation contracts involved.

In other words, I never saw these figures put together. I mean I believe if you put all the figures together, this coincidence that you are trying to point out here just does not occur.

Mr. Dixon. I assure you, sir, the Agency put them together. We did not put them together. This is the information on their total purchases, and this is the way it came out. This is it, Mr. Duncan.

Mr. Duncan. No, I don't think you will find that information is complete. I wish you would go back and ask them.

You see, they treat a lot of dependents of servicemen as well as servicemen themselves, so they had been using a suspension, but they always prefer a liquid because children take a liquid much better than they take a suspension, and there was a big contract that came in here—I can't recall these events—it was something like 6 months ago, that was a substantial amount. We thought we would get it because we had our products specified, and Squibb took it.

So that certainly is not here, and I think there were two rotation contracts that came in here somewhere, so I just don't believe you have included all the items.

Senator Kefauver. We asked the Agency for this information and this is what they gave us.

Mr. Dixon. Mr. Chairman, I understand this to be the total up to the time that the Italian entrance into this market changed the situation.

Are you talking prior to that time or after that time?

Mr. Duncan. My recollection—

Mr. Hesse. The Italian was October 28, 1959, the first Italian, but it was only capsules.

Mr. Duncan. All I know is that that was at least one purchase of a very important product. That is second only to

tablets in our civilian market, and that is not included here.

Mr. Dixon. We will have the MMSA before us tomorrow, and we will refer to this. But this is a long-term period, 3 years. Over this 3-year period, Pfizer received 47 percent of the business and the other three divided practically equally.

Do you have any explanation for that?

Mr. Duncan. Let me ask you another question.

Are you sure you have not picked this period—for example, you say November 1956. Does that include the first contract which we got on tetracycline?

Mr. Dixon. This, as I understand it, is from the first time the Agency bought tetracycline up to the time that the Italians entered the market, which apparently disrupted the situation. They said it was for all forms of tetracycline.

Mr. Duncan. I don't know about disrupting the situation. All I can say is I just don't think these figures are complete.

You picked a period here where the figures come out this way, but this is not the complete purchases from the time they first bought tetracycline up to the present time.

Senator Kefauver. Suppose you take this exhibit and if you can complete it tonight, if you have any figures to add, do so. In the meantime, we will ask Admiral Knickerbocker about it tomorrow. It includes the same period of time as is contained in the chart marked "Exhibit 21", from the time tetracycline was first purchased by MMSA until the Italian company come into the market.

Mr. Duncan. Senator, this is obviously a selected period and selected products, and until we have a chance to check it against our own records, I can't make any comment on it.

Mr. Dixon. Mr. Chairman, before we go, I want to make one comment.

Tetracycline is tetracycline, isn't it?

Dr. Malcolm. Yes sir. If it is a pure substance.

Mr. Dixon. And it has to be certified and passed on?

Dr. Malcolm. That is correct, sir.

Mr. Dixon. During your statement, Dr. Malcolm, you made two references. In the exhibits that you presented, for instance, on your table 5, you showed the importance of Achromycin, which, as I understand it, is your form of tetracycline; is that correct?

Dr. Malcolm. Yes.

Mr. Dixon. You showed your dollar sales there in millions of dollars. Later in your statement you pointed out your promotion expenses and you broke them down on the table after page 22 to the total amount of $3.51 per doctor per month. You said this is for 200,000 doctors, and my arithmetic says that adds up to $700,000 per month; isn't that correct?

Dr. Malcolm. Yes, I am sure that represents all Lederle products.

Mr. Dixon. That is right. But as I understood your statement, $3.51 is spent per doctor per month. Since you figure that on 200,000 doctors, that total is $700,000?

Dr. Malcolm. Yes.

Mr. Dixon. I would assume that a great deal of that promotion had to do with this important product of yours, Achromycin; isn't that correct?

Dr. Malcolm. That is correct. You select your leading items and you spend a proportionate share of advertising and promotion and detailing on your leading items.

Mr. Dixon. My point is this, sir:

You spent a great deal of money trying to convince the American doctor that your product—which is identical with four others—is superior, haven't you?

Dr. Malcolm. It is identical from the standpoint of the pure substance, but there is a great deal of processing which takes place from there on.

Mr. Dixon. But you could not sell that product unless it was certified and ex-

amined by the Food and Drug Administration?

Dr. Malcolm. That is correct.

Mr. Dixon. Nor could anyone else?

Dr. Malcolm. That is correct, but—

Mr. Dixon. And it has to meet those standards, does it not?

Dr. Malcolm. That is true, but in some instances, as I pointed out, I think we go beyond even certification standards.

Mr. Dixon. What you are trying to say is that an identical product is still better if you make it, is that it?

Dr. Malcolm. Absolutely. Thank you, sir.

Mr. Dixon. I will say this: the Food and Drug Administration set up the standards, did they not, and if other companies met those standards, they are adequate, are they not, sir?

Dr. Malcolm. They are minimum adequate standards, yes.

Senator Kefauver. I wonder, instead of spending $700,000 a month in trying to convince doctors that your product is superior, why some of that $700,000 spent on a price reduction wouldn't have increased your sales?

Dr. Malcolm. Mr. Chairman, there are other products against which we are competing, and we even have to paddle downstream in this highly competitive industry.

And, in our opinion, the sums of money being spent in acquainting the doctor with our products is very well spent.

If you do not maintain your markets, they soon—

Senator Kefauver. $700,000 a month is $8,400,000 a year. You gave us the figure that you spent $50 million on sales—

Dr. Malcolm. That is out of $200 million total sales, Mr. Chairman. You won't find that exorbitant in terms of the fact that we have several hundred products that we are trying to sell.

Senator Kefauver. What I am asking is which of your exhibits is correct—your chart which shows you to spend $8

million a year or your table that shows that you spent $50,418,000 a year. In other words, you sent us—

Dr. Malcolm. I do not follow that.

Senator Kefauver. Selling and distribution, I take it, includes many items.

Dr. Malcolm. Are you talking about total selling expense including detailed promotion, samples, and so forth? Yes.

Senator Kefauver. For drugs, that is right.

Mr. Dixon. You were talking about them on your chart: samples, journal advertising, mail advertising, other advertising, and other promotion. So you are talking about the same thing.

(The chart referred to, exhibit 10, may be found on p. 13645.)

Dr. Malcolm. This is advertising and sales promotion. That has no reference whatever to the money spent on distribution, detailing, about 800 detail men.

Mr. Dixon. Eight hundred detail men?

Dr. Malcolm. Yes.

Senator Kefauver. I think we ought to get this straightened out. On the information you provided us in response to our subpena, you have listed samples, $5,814,000. That category is included in your chart, exhibit 10. You have direct mail, $2,600,000. That category is also in exhibit 10. You have periodicals, including journals, $5 million. You have other sales promotion, $4,433,000, and other advertising, $1,511,000. That is over $19 million right there.

Dr. Malcolm. I am not familiar with this. Is this Form 1: Comparative Income and Expense?

May I refer that to Mr. Duncan?

Mr. Duncan. I think probably the difference is this statement you are referring to, Senator is our worldwide drug business. Now, the chart I think, Mr. Dixon, that you are referring to has to do only with our domestic advertising and sales promotion.

Senator Kefauver. I think we ought to straighten out what it does or does not say.

Is this based upon what you spend on doctors in the United States and on others in your international business?

Mr. Duncan. That is correct.

Mr. Dixon. Do you advertise only to doctors in the United States, or anywhere in the world?

Mr. Duncan. I didn't get that question.

Mr. Dixon. All of your advertising and promotion is directed to doctors wherever they are, isn't that correct?

Mr. Duncan. Yes, but the difference in those figures is that in the statement we have more details. That includes the doctors in the United States and includes only advertising and promotion expenses in the United States. This form which we submitted with the breakdown is our worldwide drug business as it states here on the second page.

Mr. Dixon. You are saying that you spent six times this amount for advertising and promotion outside the United States. Is that what you want us to believe?

\* \* \* \* \* \*

**Administered Prices**

———

THURSDAY, SEPTEMBER 8, 1960

U.S. Senate
Subcommittee on Antitrust
and Monopoly of the
Committee on the Judiciary,
Washington, D.C.

The subcommittee met, pursuant to recess, at 10:12 a. m., in the caucus room, Old Senate Office Building, Senator Estes Kefauver presiding.

Present: Senators Kefauver (chairman), Hart, Dirksen, and Hruska.

Also present: Paul Rand Dixon, counsel and staff directors; Horace L. Flurry, counsel; Peter N. Chumbris, counsel for the minority; Nicholas N. Kittrie, counsel for the minority; George E. Clifford, assistant counsel; Dr. John M. Blair, chief economist; Lucile B. Wendt, attorney; Dr. E. Wayles

Browne, Jr., economist; Dorothy D. Goodwin, attorney; Dr. Irene Till, economist; Paul S. Green, editorial director; and Gladys E. Montier, clerk.

Senator Kefauver. The committee will come to order.

\* \* \* \* \* \*

Mr. Duncan. Senator, there was one other thing left open on exhibit 22. Did you intend to refer to that, Mr. Dixon?

Mr. Dixon. Sir?

Mr. Duncan. You presented late last night, when we were all rather tired, this exhibit 22 on purchases of tetracycline.

Mr. Dixon. Yes, we did.

Mr. Duncan. And asked us for any comments, and we had a chance to check the figures last night and we wanted to comment on that exhibit.

Is this the appropriate place to do it?

Senator Kefauver. All right, sir, you may do so now. Suppose you give us the percentages that you have.

Mr. Duncan. Yes.

Now, we have—I would like for you just to look quickly at these figures. It will take only a moment. What we did was—while they are handing them out—what this chart, exhibit No. 22, showed were the Tetracycline purchases from November 1956, to October 1959.

I don't know what implications Mr. Dixon intended to read into this, but he pointed out the similarity of some of the percentage figures shown on that chart.

\* \* \* \* \* \*

Mr. Dixon. Mr. Chairman, before you leave that point, I believe you stated, Mr. Duncan, that the Veterans' Administration never in the past bought in large quantities.

Mr. Duncan. That is right.

Mr. Dixon. I have before me exhibit 21, which lists bids to MMSA. In October of 1956 you bid $11 and won the award. In May of 1957 Pfizer bid $11 and won the award. Now in September of 1957 the Veterans' Administration sought 50,000 bottles. That is not a small order.

Mr. Duncan. How much did they award? You see, they always quote very large quantities to lure you into a low price.

Mr. Dixon. The total price was $880,000. That is not insignificant. The unit price secured from Pfizer on that order was $17.60. But Lederle bid $19.58.

Mr. Duncan. Was the award—the award was $880,000? If so, it is the biggest order they had ever placed.

Mr. Dixon. Then again in March 1958 on an advertised bid for $50,000, Pfizer bid a $17.24 unit cost for a $862,000 order.

Mr. Duncan. Mr. Dixon, without those figures in front of me, I cannot check all the figures and see just what you are talking about. I am merely saying that the awards, except for maybe the one you are mentioning there, have always been small. Mostly they were merely hunting licenses, not firm contracts as they were with the MMSA.

Mr. Dixon. The observation I make, Mr. Duncan, is this: Twice MMSA was able to secure tetracycline in bottles of 100 for $11. At that time the Veterans' Administration was paying considerably more, about $19.58. The VA went to the MMSA trying to get its order grouped with the MMSA order, and the next time that MMSA came back and tried to purchase a sizable order, the price went back up from $11.

Mr. Duncan. I was never aware—

Mr. Dixon. And stayed up.

Mr. Duncan. In fact, I had always wondered why the MMSA had not been buying for the Veterans' Administration for several years. In fact, I once asked Captain Wise why that was not the case. I have never had any information to this day that they were doing that or were interested in doing that.

I raised the question because they are both Federal Government agencies and I could not understand myself why they did not get together. But I never had any information that they ever had or that the proposal had been made.

Senator Kefauver. I do not know whether we completed the patent question yesterday or not. You said when this patent matter was settled, Pfizer insisted on buying tetracycline from you in bulk. They were not manufacturing it at that time themselves.

Dr. Malcolm. No. We were the only manufacturer of tetracycline at that time.

Senator Kefauver. Do they manufacture it now?

Dr. Malcolm. Yes; they do.

Senator Kefauver. How long did you supply them theirs in bulk?

Dr. Malcolm. I do not know the exact period in term of weeks, but it was a very short period of time.

Senator Kefauver. Was that the finished product?

Dr. Malcolm. That was in bulk form.

Senator Kefauver. Ready to be tested and bottled or capsuled?

Dr. Malcolm. Ready to be tested, bottled and finished.

Senator Kefauver. What was your price to Pfizer?

Dr. Malcolm. I do not recall exactly the price, but I think it averaged out in terms of the total quantities they purchased in the neighborhood of 37 cents a gram.

Senator Kefauver. 37 cents a gram?

Dr. Malcolm. Yes.

Senator Kefauver. It might have been a little below or a little above?

Dr. Malcolm. In the beginning it might have been a little above, I do not know. But it averaged out around 37 cents a gram.

Senator Kefauver. And what was to be done afterwards? You made a good product. They tested it, bottled it, and put their label on it?

Dr. Malcolm. I presume so. After it left our hands, it was, of course, their responsibility.

Now, the period Mr. Duncan speaks of is the period after the expiration of the agreement or the disagreement between

Farmitalia and Alfar and our date of acquisition, at which time Farmitalia joined the ranks of Laikti and the eight others who are now manufacturing tetracycline and trying to sell it all over the world.

Mr. Dixon. All right, sir.

Now, I want to address myself to the recently announced 15-percent price reduction of antibiotics.

Mr. Duncan, are you going to answer, or is Dr. Malcolm?

Dr. Malcolm. Mr. Duncan.

Mr. Dixon. All right.

Mr. Duncan, on or about August 1, there appeared in the press an announcement that a 15-percent price reduction was going to be made across the board on broad-spectrum antibiotics.

Will you explain to us your method of merchandising tetracycline as an example, or all of your antibiotics, to the retailer prior to this time?

Mr. Duncan. Yes.

We have a number of so-called direct accounts to whom we sell directly. We supply them from about 13 of our branches located all over the country.

These accounts consist not only of drugstores but of a number of private hospitals. We also—those are the direct accounts we handle and they are the larger and more important accounts.

We also supply our products through the wholesaler to whom we gave at that time a discount, I believe, of 16⅔ and 5 percent below the retail price.

Mr. Dixon. 16⅔ plus 5?

Mr. Duncan. We are talking tetracycline. It is easier to talk a specific product.

Mr. Dixon. Yes, sir.

That was the condition that existed prior to your change?

Mr. Duncan. Yes. I believe the prices were $30.60 to the retail trade per bottle of a hundred and the wholesale price, $24.22, or something like that.

Mr. Dixon. $24.22.

Now, what is the change that you have made?

Mr. Duncan. Pfizer was the first company that made the move. They reduced—let me take a moment—they reduced the price to direct accounts by 15 percent, and that figure, as I remember, was around what—$26? Somewhere around that figure.

Senator Kefauver. $26.01.

Mr. Duncan. $26; that is correct.

Now, we followed that. This happened on a Saturday. They tried to steal a march on the industry, I guess. They sent out telegrams to the trade on a Saturday.

Senator Kefauver. They tried to do what?

Mr. Duncan. Steal a march on the rest of the industry, I suppose, because they did this on a Saturday.

Senator Kefauver. You mean after 10 years of operation, they should suddenly steal a march on you?

Mr. Duncan. Yes, Senator.

These things happen very rapidly. If you can get any kind of an advantage on your competitors, you try to do so.

So they confronted us, they did this, as I recall, on a Saturday morning, and the first thing I heard about it was at 8:15 on Monday morning, when my sales department was in my office practically having hysterics about meeting it immediately.

Senator Dirksen. It proves there is no competition, doesn't it?

Mr. Duncan. Yes.

Mr. Dixon. Let's keep to the subject. And you met it? Did you meet their price?

Mr. Duncan. Yes; we met it.

Mr. Dixon. Just exactly how did you meet it?

Mr. Duncan. Prior to that time, going back for a long time, we had had a so-called Lederle plan. Now, under the Lederle plan our direct accounts with whom we dealt directly, and we were happy to deal directly with anyone who could give us a substantial order a

month, was to allow them an extra discount of 7½ percent, I think, on a $50 order and 15 percent on a $100 order. So what we did—now, let me say this was the case on all our products with the sole exception of our antibiotics. Now, what we did in order to meet this price immediately was to put the tetracycline on the regular Lederle plan, so that it meant that any direct account buying a $100 order would buy it at $26.01.

Mr. Dixon. He would get 15 percent off?

Mr. Duncan. Yes.

Mr. Dixon. If he bought a $100 total order?

Mr. Duncan. Yes.

Mr. Dixon. Prior to that time, if a retail pharmacist wanted to buy antibiotics or tetracycline, he had to go to the jobber to get it, is that correct?

Mr. Duncan. Or to us.

Mr. Dixon. Or to you.

Mr. Duncan. Yes.

Mr. Dixon. In the past, would you give him 15 percent off if he came straight to you?

Mr. Duncan. No, we did not have that on the Lederle plan.

Mr. Dixon. So in the past he went to the wholesaler for it?

Mr. Duncan. Actually, he did not. Specifically, the business was divided about 50-50. In other words, the wholesalers did about 50 percent of the antibiotic business and we did the other 50 percent direct.

Mr. Dixon. Let's talk about those who did go to wholesalers. If they went to the wholesaler, the wholesaler got a price of 16⅔ percent, plus 5 percent discount?

Mr. Duncan. Yes.

Mr. Dixon. Under your new plan, if the retailer comes straight to you, he will only get 15 percent?

Mr. Duncan. That is correct.

Mr. Dixon. So actually, on the business that previously passed through the wholesaler's hands and that may come straight to you from the retailer, you will come out the winner, won't you? There is the difference between 16⅔ plus 5 and 15, is that correct?

Mr. Duncan. To that extent, yes.

Senator Kefauver. Let's see if I get this clear. You mean that whereas previously your wholesaler got 16⅔ plus 5, as his margin, and then when the retailer purchased at $30.50 from you, he purchased it at the same price from the wholesaler.

Mr. Duncan. That is correct.

Senator Kefauver. And now, you have given the retailer a 15 percent discount when he purchases it directly from you. Have you done nothing to enable the wholesaler to continue his business?

Mr. Duncan. Up to this point this is a practice which we have followed on all our other products for quite a long time, Senator. What we have done, on all the products except tetracycline for a period of several years we have had this plan in effect. What we tried to do is this: We can handle the larger accounts on a direct basis, and we do, and have been doing so on our other products for quite a long time. Now on many of the smaller drugstores and small accounts, over the country, those are normally the accounts that the wholesaler handles. In a typical product 30 to 35 percent of the business will go through the wholesaler. He performs many functions for them. He fills out their line.

Senator Kefauver. Yes, we know that, but as to the wholesalers' situation on tetracycline, he only has left a 6⅔-percent margin in which to operate.

Mr. Duncan. Yes. Now, actually, each company's distribution plan varies very considerably.

Senator Kefauver. I am just talking about your plan. In other words, he did have a 21⅔-percent margin on which to operate. He now has only a 6⅔-percent margin because you have not given him a discount.

Mr. Duncan. In many cases you will find that the wholesaler, because he performs these other functions, charges a higher price than we do to our direct

accounts. We give that only to those accounts that can buy in sufficient volume to cut the costs and enable us to do it. Now, the wholesaler habitually will sell at a higher price than we will sell direct because he performs a number of other functions.

Senator Kefauver. Aren't you going to put your wholesalers out of busines?

Mr. Duncan. No; because except for tetracycline, this has been our plan of distribution for at least the last 7 years or 8 years on all our other products.

Mr. Dixon. Let us get this in dollar figures so we can understand it. Previously, you sold, and you still sell to your wholesalers, at $24.22 for a hundred?

Mr. Duncan. That is correct; we have not changed that price.

Mr. Dixon. Now, under your new plan, if you sell straight to the retailer, what will that price be per hundred, $26?

Mr. Duncan. On $100 orders, only on large orders, $26.01.

Mr. Dixon. So you are going to make practically $2 more on those orders?

Mr. Duncan. It is questionable how much of the wholesaler business we will take because we do not pretend to give all the services which a wholesaler provides. And many other companies have a one-price policy that charges the same price to the retailer and the wholesaler. Each company's distribution plan varies very considerably, and so we really are only formalizing in putting tetracycline—

Senator Kefauver. That does not answer the question. On the plan you have worked out, you were selling to the wholesaler at $24.22, but you are now going to bypass the wholesaler. The practical effect, of course, will be that he cannot operate on a 6⅔-percent margin, selling direct to the druggist at $26.01, so that you are going to be getting $1.80 more for your product than you were before.

Mr. Duncan. Actually, the wholesaler has been operating on every other prod-

uct in our line for the period of the last 7 or 8 years on this margin. As I say, for the services he performs he does not sell at $26.01. He sells at a higher price to many of these accounts, because they buy in very small quantities. He provides their inventory control. He carries their stock for them. He performs all kinds of services. As I say, really the distribution plan of one or two of the other companies is a one-price policy to wholesalers and retailers and even there the wholesaler does a very substantial amount of business.

Senator Kefauver. There must have been some good reason for your giving the wholesaler 16⅔ plus 5 for a long, long time to enable him to stay in business. You are now reducing that to where he will only get 6⅔ percent. If your reason for giving him a 21⅔ percent in the beginning was sound, why do you reduce him to 6⅔ percent now?

Mr. Duncan. This wholesale discount goes back for a long period. As I say, 7 or 8 years ago we decided that we could perform the same function as the wholesaler performs and should do so on major products, on major orders. We have not tried to do so on smaller orders. So our distribution system is simply a blend of the two things, direct sale to direct accounts, and use of the wholesaler on the hundreds of thousands of nondirect accounts.

Senator Kefauver. Why do you object to giving the wholesaler the 15-percent reduction, too?

Mr. Duncan. We do not feel it is necessary. We have been wanting to place tetracycline on the same basis as our other products for quite a long time. This afforded a good opportunity to do so and now we have a standard policy right through the line.

Mr. Dixon. And everybody is doing the same thing?

Mr. Duncan. No; I do not think so. Look, I have been preparing for the hearing and I am not up to date, but I believe that Squibb and Bristol at least, and I do not know who else, has dropped the wholesale price from $24.20 or what-

ever their price was, to something less than $22. I cannot testify on this directly, Mr. Dixon, because I have not been close enough to these events and they have been happening too rapidly.

Mr. Dixon. I will read from the so-called Green Sheet called Weekly Pharmacy Reports. This appears:

The news this week, August 29, 1960. The month-old "trade discount adjustment" on tetracycline, first announced for August 1 by Pfizer, became a frank price cut on antibiotics last week when Lilly and Upjohn took the final, inevitable steps of reducing prices at all levels including the suggested price to the consumer. This is the first significant price reduction in a major area of drug therapy since the penicillin and cortisone price wars of the early and mid-1950's.

I want to ask you whether you have reduced your fair trade prices to the consumer yet.

Mr. Duncan. We have not yet.

Mr. Dixon. You have not?

Mr. Duncan. Not yet.

Mr. Dixon. So that the extra 15 percent under your present policies has to stay in the druggist's hands. He has no choice under fair trade.

Mr. Duncan. Not entirely. After all, as you well know, there is a difference between our suggested price and our fair trade price, which affords merely the floor. We do not try to dictate what druggists charge.

But the fair trade price does constitute a floor which is 10 percent below the suggested price.

Mr. Dixon. In those States that have fair trade prices, if the druggists were selling at the fair trade price, had he passed it along, he would be violating the law today under your policies; would he not?

Mr. Duncan. That is right.

Mr. Dixon. So it is not a price reduction to the consumer under your plan yet; is it?

Mr. Duncan. Not yet. The reason I say not yet is that I have been involved with other things, and haven't had a chance to follow these very fast-moving developments, and I am not prepared to say exactly what course of action we will take. But we probably will meet competition as we have always done.

Mr. Dixon. We have examined this in great detail earlier—for instance, your price to the druggist previously per hundred was $30.60.

Mr. Duncan. That is correct.

Mr. Dixon. Your suggested price to the consumer was $51.

Mr. Duncan. That is correct.

Mr. Dixon. I believe that is a 66⅔-percent markup that you suggest.

Mr. Duncan. Or a 40-percent margin as they look at it.

Mr. Dixon. They look at it backwards. In my way of thinking, if you buy something for $30 and you mark it up to that, I think that is a markup going that way.

Mr. Duncan. Well, now, that also, not to digress, is kind of a mathematical trick on the thing. We have used this markup. For example, you can look at it from the standpoint of aureomycin. We reduced it from $15 to $5 so that is a reduction of only 66 percent. In fact, if we had reduced it to $1 you couldn't reduce it 100 percent but if you raise it from $5 to $15 that would have been a 300–percent markup, so to some extent this markup is a mathematical trick, kind of a gimmick.

Senator Kefauver. In any event, we were all elated over the fact that for the first time in 10 years there was, we thought, a price reduction to the consumer and that you were going to sell at 15 percent less. It now develops that so far as you are concerned, you are fixing the price at $51 as the minimum price that a retailer can sell for; it is still $51.

Mr. Duncan. $45.90, Senator. The floor is 10 percent under the suggested price so the floor, I think, is $45.90.

Senator Kefauver. Anyway you have not changed the floor.

Mr. Duncan. We have not changed the floor as yet.

Senator Kefauver. So that even if the retailer in a fair trade State wanted to pass on this 15 percent to the customer, he could not do so under your plan.

Mr. Duncan. As of this morning. As I say, this is under serious study. We have had these fast-moving developments, and in the past we have always met this competition. I haven't had the time to give it the thought or even to catch up and find out factually exactly what has happened, because the distribution of our competing companies, their distribution systems vary and it is hard to get the details.

Mr. Dixon. Mr. Chairman, on that point, in this same issue of the green sheet that I read from, this appears:

Upjohn's tetracycline fair trade minimum revised downward. Upjohn followed through with a letter to retail pharmacists announcing "comparable percentage reduction in the minimum resale price" of its tetracycline products on which it had previously reduced the net price to retailers. "Price adjustments," Upjohn told its retail pharmacy customers, "on packages purchased prior to August 9, 1960, and in your inventory on August 20, 1960, will be allowed when reported to our salesmen together with the invoice date. Bristol Labs * * * had earlier brought its price structure into line. It affected a 15-percent price cut by establishing a schedule of net prices. Pfizer, Lederle, and Squibb are still confronted with the question of frankly admitting that their earlier actions on tetracycline have now become plain price cuts across the board. To do this, they have to adjust downward their suggested retail-to-consumer prices which form the base against which their trade discounts are computed.

And so on.

Dr. Malcolm. Mr. Chairman, I don't think that you can ask us to make a price decision, here, can you? It is a matter under very serious discussion among us, and it is something that we will have to deal with after we get back home.

Senator Kefauver. We are not asking you to make any price decision here. This happened on August 1. It is now September 8.

Dr. Malcolm. Not August 1.

Senator Kefauver. Excuse me, this happened on July 31, effective August 1.

Mr. Duncan. Not the price to the retailer, Senator. This has been a very mixed and muddled situation with a succession of moves.

Senator Kefauver. I have here Pfizer's telegram to one of the pharmacists dated July 30, reducing the price 15 percent.

Mr. Duncan. To the retail trade only, and we met that immediately.

Senator Kefauver. Yes, and here is your telegram of August 3.

Mr. Duncan. That is right.

Senator Kefauver. In which you do the same thing. So this has been in effect over a month, and you haven't done anything about it.

Mr. Duncan. This has only been just moving down the retail trade price. That is all we did.

Senator Kefauver. And you haven't done anything about allowing wholesalers any adjustment?

Mr. Duncan. Not to this point. We have simply got our tetracycline in line with all our other products.

Senator Kefauver. Assuming that the wholesaler can't operate on a $6\frac{2}{3}$-percent markup, and I don't think he can, because he has to keep a large stock—

Dr. Malcolm. Of course. They have been doing it.

Senator Kefauver. They are going to be put out of business insofar as tetracycline is concerned. The net result will then be that you will be selling the product at a higher price actually than you were before.

* * * * * *

Mr. Dixon. You fair-trade your products, do you not?

Mr. Duncan. Yes, we do at the retail level only, not the wholesale.

Mr. Dixon. Who sets that retail fair-trade price?

Mr. Duncan. We do.

Mr. Dixon. You do it independently?

Mr. Duncan. We certainly do, yes.

Mr. Dixon. You do not take the druggist into your confidence? You do not talk to them, about what they desire? You do it, is that it?

Mr. Duncan. We do it, yes.

Senator Kefauver. Let me ask this: I have always wondered—

Dr. Malcolm. There are 28,000 druggists.

Senator Kefauver. The druggist is entitled to make a reasonable profit. You do not talk about his business with him, so how can you fix a minimum fair-trade price? How can you know that the druggist is going to come out all right, that he will make a fair amount of money? How can you know that the position of the consumer is going to be protected? I do not see how you just arrive at these fair-trade prices in a vacuum without considering the consumer, without considering the druggists, or without talking it over with them.

Mr. Duncan. As we said yesterday, we set our competitive prices and the prices we charge are the prices to the retail trade, the so-called net trade price. Now we have to set that, as we pointed out yesterday, with a great many things in mind, and I won't go through it again, but competition is a very important factor, and a lot of the other things, the money we have to invest in plant facilities, obsolescence and so forth. Now as you well know, there is—over the years there has grown up an established practice of allowing the druggist to mark it up over our price, as Mr. Dixon has said, 66⅔, or to operate at a margin of 40 percent. So that simply follows logically from the price which we set on the basis of all the factors we have talked about.

Mr. Dixon. If you will examine exhibit 18, which we put in the record yesterday, you will note that the suggested resale prices to consumers of tetracycline, Aureomycin and Terramycin in any solution form that you can think of are identical as among the different manufacturers. How does that come about?

Mr. Duncan. I can only answer your question on the capsules which are the leading product that I know about, and on the others so far as I know, if they are identical products competition is going to keep the price the same.

Mr. Dixon. Do you call it competition when you set the fair-trade price?

Mr. Duncan. I really am setting a price to the druggist in the hospital. Naturally, the net trade price follows routinely from whatever price we set.

Mr. Dixon. Yes, but my point is this: The druggist cannot sell below that price.

Mr. Duncan. That is correct.

Mr. Dixon. In fair trade.

Mr. Duncan. In fair trade States.

Mr. Dixon. And you set it. You set the minimum level to which he must adhere or he violates the law. You set the price.

Mr. Duncan. We do not set the price. We set a floor. All we are saying is that we suggest a price 66⅔ percent above our net trade price. We suggest that price. That has been a practice for a long time. We then set a net trade price as a floor, 10 percent below that. The druggist charges anything he feels he needs to charge because the circumstances will vary.

Mr. Dixon. Above your floor.

Mr. Duncan. Above the fair-trade price. That is the floor.

Mr. Dixon. And your floor on 100 tablets was $49.90.

Mr. Duncan. $45.90 for our capsules; 10 percent under.

Mr. Dixon. And 10 percent is added to that. Now we note all other sellers set the same floor.

Mr. Duncan. I would assume that it would follow if we were competing and the price were the same, the net trade

price were the same to the retail druggist, then I won't pretend to speak for what the others did or how they intended to do it, but so far as we were concerned, we followed the same practice we follow on every other one of our products.

Mr. Dixon. Yesterday, Dr. Malcolm, when he was making his statement, put in the record and exhibit which we marked as "Exhibit 9". It purports to represent the distribution of the consumer's dollar paid for Lederle drugs in 1958. You took the dollar and you said the manufacturer received 51 cents, and the retailer and wholesaler received 49 cents. That was figured on your suggested sale price to the consumers.

Mr. Duncan. Yes, that is correct.

Mr. Dixon. So really you are the one who is fixing the consumer price, then, are you not?

Mr. Duncan. No, no, we are setting a floor. We are simply setting a floor on the basis of net trade, and the retail druggist sets the price. The price varies in many cities.

Mr. Dixon. Let's talk about the floor, then, $45.90. It is you who is determining as a matter of law in fair-trade States what the consumer must pay regardless of how that dollar that he spends is split up, the minimum amount that he must spend, isn't that correct?

Mr. Duncan. Yes, in the fair trade States. That is what the fair trade law is.

Mr. Dixon. Many people in the country think the druggists are responsible for this, but you are responsible for it because you are the ones who are setting that price.

Dr. Malcolm. The fair trade law is responsible for it.

Mr. Dixon. You do not have to follow fair trade. You choose to do it. It is not imposed upon you.

Mr. Duncan. We choose to do it for a very good reason.

Dr. Malcolm. We choose to do it in States where it is legal because we believe in fair trade.

Mr. Duncan. We do not want to go into it in detail, but we feel it protects the small druggist and believe me, the opportunities for a small businessman are getting more and more limited and we are strongly in favor of fair trade.

Senator Dirksen. Mr. Duncan, before we get too far afield, I want to refer to the chairman's observation as to whether you confer with the druggist before setting prices. I was afraid you might "shoot from the hip" by way of an answer, because if you did confer, the chance are we would have you in here before this committee or some other committee on the grounds of collusion in setting prices.

Mr. Dixon. That is for sure if he agreed to do this, he certainly would be, sir. I agree with you.

Senator Kefauver. It is difficult to understand what the requirements of a drugstore are, unless there is some information that you get from somewhere. I think you would have to know what they are paying their pharmacists, what their rents are. I do not know how you would get that unless you talked either with them or with somebody who had information about those matters. Otherwise, you are just shooting in the dark.

Mr. Duncan. To my knowledge, this 40-percent margin which the druggist had, it goes back long before my time as a regular established practice.

Mr. Dixon. Mr. Duncan, let's examine this from the other end. I had a call from a small druggist who said, in effect, "I will not be able to predict the peak periods when antibiotics should be on my shelf in great quantities, and for me to take advantage of the 15-percent reduction, I not only would have to buy a particular antibiotic but I would have to buy all antibiotics," and he said "I would have to seek a small business loan in order to buy stock." He said therefore in the instance of the manufacturer who has lowered the suggested price to the consumer, already lowered it by the 15 percent coming the other way, "I am going to find myself in the position of having to buy from the jobber." And he

said, "Therefore, when I buy from the jobber, I am not going to be able to sell for $51 a hundred any more. I am going to have to sell for the new price which will have been established." He said, "I won't get the 15 percent. I will have to go back to the jobber and therefore, I won't have that advantage, but my ultimate price to the consumer will come down." Do you have any comment on that?

Mr. Duncan. If he will buy $100 worth, we will be glad to give him 15 percent.

Mr. Dixon. He understands that, but he says he has to buy $100 from everybody and he has to keep that material there and have it in enough quantity to be able to meet the consumer demand.

Mr. Duncan. Yes. Of course, all these plans vary. That is not the case in the case of Pfizer, I believe; from their announcement in the telegram that the Senator read, it indicated at least if he even bought one bottle from them, he would get the 15 percent.

Senator Kefauver. No. The Pfizer telegram says:

Orders containing minimum $100 Pfizer Laboratories broad spectrums placed by August 26 will carry dating effective November 1.

Mr. Duncan. But wasn't that a special dating provision? Isn't it true, Mr. Dixon, as far as buying is concerned, he got the 15 percent on one bottle? I think that was a special, also a special inducement they were offering for a limited period. You see there, all these plans differ.

Senator Kefauver. All right, sir.

Mr. Dixon. Mr. Duncan, on this point of selling to Government agencies as well as to retailers, we understand that you are in competition with your own wholesaler. Based upon evidence that we have had called to our attention, isn't it a fact that you have disciplined wholesalers who in the past cut the price of your products?

Dr. Malcolm. Never.

Mr. Duncan. I don't remember of any instance, and certainly not since fair trade was knocked out to wholesalers.

Mr. Dixon. Let me try to call some of them to your attention. We understand, based upon an exhibit in the Federal Trade Commission case, that you withdrew an additional 5-percent discount, which you normally granted to all wholesalers, from the Hale Justis Drug Co., Cincinnati, Ohio. That is exhibit 624 in that record. This discount withdrawal was made by you because during August 1954 the Hale Justis Co. bid a lower price to the city of Cincinnati on Roerig-Pfizer tetracycline products than on Cyanamid products. This is exhibit 926. We understood that this discount was withheld for a period of about 8 months and that eventually you restored this 5 percent discount to this wholesaler during May 1955 because Hale Justis had been most cooperative including— and I quote from that exhibit—

on all bid requests information from our office concerning correct prices and discounts to allow.

We also understood that you publicized this incident to all your regional managers by exhibit 820, and that this was done, I suppose, to make all these managers aware of this so they could spread the word. I don't know whether that is true or not.

Now Brown & Price on a bid that called for either aureomycin or terramycin—

Dr. Malcolm. Mr. Chairman, if I may interrupt, this is information that is now before the Federal Trade Commission, and we are not prepared here to comment on these matters in detail. I don't think it is even fair to do so. So if you want some memorandum submitted on this, we will attempt to do it for you.

(A memorandum subsequently submitted may be found on p. 16487.)

Mr. Dixon. I don't see that this has anything to do with the Federal Trade Commission.

Dr. Malcolm. It is before the Federal Trade Commission.

Mr. Dixon. You are before the Subcommittee on Antitrust and Monopoly of the Senate *on the same subject matter*. (Emphasis supplied.)

Dr. Malcolm. We are not prepared to submit material.

Senator Kefauver. The thing is, we have been talking about wholesalers, and from this record, and I have looked at part of it, it would seem that some of your wholesalers may in some cases have sold at a lower price to the druggist or to hospitals than you would sell, and that you have taken action to chastise them and cut off part of their account, to reprimand them, and that you have passed word on to all of your sales representatives about what you had done in order to try and get them back in line. Is that a policy you follow?

Senator Dirksen. Mr. Chairman, before Dr. Malcolm answers, I think this committee had better remember that the Federal Trade Commission does have authority to issue cease and desist orders and that is punitive in character. I do not believe you should be called upon to respond to any line of inquiry that in your judgment may prejudice the case before a regulatory agency of Government that is equipped with that power.

Dr. Malcolm. Thank you, sir.

Mr. Dixon. Senator Dirksen, if you will excuse me for the comment, the Federal Trade Commission does not have punitive power. It only has the power of injunction. It can say "Stop what you have been doing."

Senator Dirksen. If that isn't punitive, I don't know what is.

Mr. Dixon. Punitive in the law, I believe—

Senator Kefauver. It has no right to issue a fine or mete out any punishment.

Dr. Malcolm. We are prepared to submit a written statement. We are not prepared now to comment on the allegations that you make. Certainly I am not familiar with them. Are you familiar with them?

Mr. Duncan. It goes back before my time.

Dr. Malcolm. So I think it is unfair to ask us to do so.

Senator Kefauver. I will tell you what we will do, then. We will give you the citations from your memorandum of instruction sent out to your wholesalers, and to your representatives about how to deal with your wholesalers, and ask you for your comment.

Dr. Malcolm. Thank you very much, sir.

Mr. Dixon. Mr. Chairman, I now want to take up the question of foreign prices.

I believe, Dr. Malcolm, that chlortetracycline was the first of the broad-spectrum antibiotics introduced. That was in 1948.

Dr. Malcolm. That is correct.

Mr. Dixon. I believe it was sold under the trade name of Aureomycin throughout the world, also; is that correct?

Dr. Malcolm. That is correct.

Mr. Dixon. How many companies have you licensed to manufacture or sell Aureomycin?

Dr. Malcolm. Throughout the world?

Mr. Dixon. Yes, sir.

Dr. Malcolm. I do not have those figures. I do not have that information at all.

Mr. Hesse, who is general manager of our international division, tells me that he has, so perhaps we can save time by referring the question to him.

Mr. Dixon. Let me read them to him and see if this is a correct list.

You have licensed Rhone-Poulenc of France, Alfar of Italy, Chemie Grunenthal of West Germany, RIT of Belgium, Pharmaceutical Industries, Inc., of the

Philippines, Laboratorios Reunidos of Spain, Interchemie of Austria, and Biochemie Gesellschaft in Austria. In addition, I believe that a number of your subsidiaries abroad have received licenses for sale in specified territories; isn't that correct?

Mr. Hesse. Also for fermentation.

\*　\*　\*　\*　\*　\*

Mr. Dixon. Some of it. And the other material is taken from public documents. So it is something that is in the public domain right now. I think that my answer to Senator Hruska could be that I do not think we are going to violate anyone's request for confidentiality. As to the basis for what Dr. Blair is going to explain here, as the chairman has described previously, a great deal of it came from the form 1 material, others came from information that is in the public domain, and in public documents now.

Mr. Clark. Would there be any objection, Mr. Chairman, if Mr. Dixon told us what the other public documents were, just so there would be no difference of opinion as to whether they are public or not?

Mr. Dixon. I think Dr. Blair will describe those sources. I would hope you would take my word. I am not doubletalking.

Dr. Bowman. Well, as a matter of definition, would you class an in camera document as a public document?

Mr. Dixon. I am not talking about an in camera document, sir. There are in the present proceeding before the Federal Trade Commission many documents that are in the public record now that are not in camera. We may very well rely upon some of that information in what you are going to hear.

Mr. Clark. Then I would like to make another objection, based not so much on confidentiality, but on fairplay, and justice, and I think sound legal grounds, that this committee should not enter into its record, or attempt to retry here, any portion of that Federal Trade Commis-

sion proceedings. That was a backbreaking proceeding. We had 11,400-some-odd pages of testimony, hundreds of exhibits, thousands of pages, over 60 witnesses, and I think it is highly irregular and improper to take a few of those documents and put them into this record here. We are really damned if we do and damned if we don't. We are not in a position to try to put in here all the evidence we put in there, which might be relevant, and rebut any inferences anybody might choose to draw from these exhibits.

We do not obviously want to be in a position of sitting here mute; if evidence that was adverse to us in that proceeding comes in here, we do not want to be in the position of trying to influence the hearing examiner who is deciding that case by taking positions here, retrying the issue here, and I just do not think that it is fair.

We have had a backbreaking proceeding there. We are still writing the brief on it. I should be back in my office doing that right now.

To be confronted with that evidence here, portions of that evidence here, not the complete record—I just don't think that is fair.

Senator Kefauver. For your information, Mr. Clark, this memorandum was written before we even asked for any documents for which you claimed any confidentiality.

As to our observation about the Federal Trade Commission and the fact that there is a trial going on or some matter has been submitted to the Federal Trade Commission in connection with the patent and whatnot, I have pointed out here before that this is a legislative committee trying to find out what has happened in the matter of concentration and monopoly, whether the laws are adequate, what public policies are involved and whether patent positions or monopoly positions are being used to bring about unreasonably high prices, whether patent

laws should be changed, or whether the Buy-American Act should be changed.

If we had to wait for the conclusion of every issue and investigation that is now pending before grand juries, the Federal Trade Commission or in the courts, we would just have to close up and go home. In practically every major line of industry—aluminum, cement, steel, electrical equipment, drugs, oil—there are either investigations going on or grand jury operations going on or matters are before the Federal Trade Commission.

Therefore, we would just go out of business if we had to wait until all of those are determined. We would have to legislate in a complete vacuum.

We are not trying to, and we shall not endeavor to, try any cases that are before any court or before the Federal Trade Commission, but I do think it is necessary that we get the facts upon which we can make determinations which are within the jurisdiction of this committee, and in which the Congress is interested.

I might say further that the only way that we can legislate is to have some record that everybody can read, the other Senators, the other Members of Congress, and the public, so that public opinion can be formed, so that Senators and Congressmen can make up their minds.

With just six or seven members of this committee having information which we could not impart to somebody else, it would not do the legislative process very much good.

\* \* \* \* \* \*

Senator Kefauver. What do you pay a royalty to Cyanamid for?

Dr. Bowman. The Aureomycin patent, fermentation.

Senator Kefauver. This deals only with tetracycline.

Dr. Bowman. Well, the fermentation process—we do pay royalty on the tetracycline that we ferment.

Mr. Dixon. You are paying a process royalty?

Dr. Bowman. That is right. It is a process.

Mr. Dixon. You are paying a product royalty to Pfizer and a process royalty to American Cyanamid?

Dr. Bowman. That is correct.

\* \* \* \* \* \*

Mr. Dixon. Mr. Chairman, before you leave that point, I understood you to say your net price on the Government bids for tetracycline—is that correct?

Dr. Bowman. I did not say anything about Government bids. I said at the ordinary levels of wholesale trade here. We have a price to Federal hospitals, institutions, and agencies, such as VA, and that sort of thing.

Senator Kefauver. You have not reduced the price to them.

Dr. Bowman. Yes.

Mr. Weeden. In that case, our price was substantially below our wholesale price, and we had no change in that particular item which was being sold under contract.

Mr. Dixon. Not the private hospitals.

Mr. Weeden. The private hospital prices were reduced.

Senator Kefauver. But I see here that your old price to the Government was $17.60, which you and the others seem to have been bidding for some time, and you continue to have a price of $17.60 for the Government; is that correct?

Mr. Weeden. That is correct.

Mr. Dixon. They did not get any bid for $17.60 anywhere to MMSA, if that is what you are talking about. There is not a $17.60 bid on exhibit 21. On tablets, at least.

Mr. Weeden. Sir, on the MMSA they submit request for formal quotations. The other Government agencies, individual installations, and so on, buy in single bottles—veterans hospitals, and so on.

And there we have a regular catalog price, filed with the agency.

Mr. Dixon. But we were not talking about MMSA. We were talking about government hospitals, such as VA, or State hospitals, or those in that class.

Mr. Weeden. Yes, sir.

Senator Kefauver. All right.

Mr. Dixon. Mr. Chairman, before we recessed, commenting on the chart that Dr. Blair offered, exhibit 69, I made the statement that I thought his figures were conservative. That statement was predicated upon the documents which we subpenaed from Bristol Laboratories. I have selected four of those documents. One of those documents, dated April 24, 1957, is from Morris S. Weeden to members of the management committee. The second document, dated May 7, 1957, is from E. C. Zimmerman to M. S. Weeden. A third document is dated May 17, 1955, from M. S. Weeden to Mr. Bowman. The fourth document, of December 26, 1957, is from C. H. Potter to a group listed below: Anderson, Ellefson, Harrell, Hallett, Reeve, Todt, Weeden, and White.

Mr. Chairman, I suggest that these four documents be assigned the exhibit numbers 70, 71, 72 and 73.

Dr. Bowman. Just a minute, before we assign numbers here.

Mr. Dixon. May I make just this further statement about these documents. These documents, Mr. Chairman, disclose the actual costs for a bottle of 100 250-milligram capsules of Tetrex, manufactured by Bristol Laboratories. They also show the amount of profits on a bottle of capsules of this size at the druggist's price level and the profit at the wholesale level.

These documents also disclose the cost of Tetrex pediatric drops, which is, I understand, one of the trade names for tetracycline. They also disclose the cost of the ingredient tetracycline base as well as other costs.

Senator Kefauver. Tetrex, as I understand it, is your trade name for tetracycline?

Dr. Bowman. Tetracycline is the generic name.

Senator Kefauver. Yes.

Mr. Dixon. The third document that I have, Mr. Chairman, shows the price per kilogram of sales at all levels by Bristol Laboratories, or an estimate by Bristol Laboratories of those sales.

The fourth document is the unit cost comparison for the month of November 1957 which discloses the average unit cost for a variety of tetracycline products.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Dixon. Are you through, sir?
Mr. Clark. No, I was waiting.

Senator Kefauver. We are listening.

Mr. Clark. Thank you, sir.

The hearing examiner in the Federal Trade Commission has ruled, I think correctly, that you can't prove very much by fragmentary costs—you need total costs. And in that proceeding, we had Price Waterhouse, a well-known accounting firm, make a special cost study, of all the costs that go into these tetracycline products, line by line and bottle size by bottle size, and we offered that to this subcommittee, and we offered it also in the Federal Trade Commission proceeding. And the hearing examiner ruled there that that was a satisfactory substitute for our entire raw records, you might say, showing fragmentary costs.

Now, I think those items, sir, constitute, if you will, new evidence, why it would be greatly prejudicial to us, to put in these fragmentary cost records, which can't help but prejudice the company here, heaven knows what it may do in the public eye and in the eye of the hearing examiner, when we have offered to you, and it is still available, and I would like to offer it to you now again, the complete

cost study made by Price Waterhouse Co. on these products.

Dr. Bowman. I might say that this cost study was for the period from 1954 to—through 1957. It was a special study. It is not the normal type of record that we keep in the course of our business. But it was prepared according to sound and good accounting principles, and it covers all our sales of products under our own label, in the United States, for those years, giving not only the sales themselves, by unit and by total—the direct costs, the allocated costs, the total costs, and the net profit for every product we sold under our label from the years 1954 to 1957. And we are prepared to make this available. Normally we would consider this information confidential.

Senator Hruska. Is that in camera in the Federal Trade Commission?

Dr. Bowman. No, it is not, because the Government, as part of their case, did not seem to want these costs. They did not prove their point. And they did not accept it—even after the hearing examiner ruled that this was a proper substitute for the fragmentary costs that they were trying to use. They appealed that decision to the full Commission. The full Commission upheld the trial examiner. But the Government did not want this as part of their case, because this shows the full, complete picture. And we would like to offer it. I am sure you want the full picture as part of your proceedings.

Senator Kefauver. You want to offer this as an exhibit?

Dr. Bowman. We would like to offer this as an exhibit.

Senator Hruska. In lieu of what you had offered before?

Dr. Bowman. Yes.

Mr. Dixon. Mr. Chairman—

Dr. Bowman. This is in lieu of the in-camera documents which they are trying to introduce here. We wish to offer this in lieu of it.

Mr. Dixon. Mr. Chairman—

Dr. Bowman. In lieu of them. And I mean all the in-camera documents, not just the four or five mentioned.

Mr. Dixon. Before you get to that, some very serious charges have been made by you, Mr. Clark. I personally resent them. You have inferred, in fact you have said, that on the staff of this committee is an employee who worked in the preparation of this case against you in the Federal Trade Commission. You are in error. An employee on the staff of this committee, Mrs. Wendt, worked upon the antibiotics report that preceded any case by a great length of time. So you are in error there.

Mr. Clark. I apologize if I am in error. I was so informed by an attorney at the Federal Trade Commission.

Mr. Dixon. So many things are misunderstood by people not knowing what they are saying, and you just did it. You said or inferred directly—and if you are correct, we should be seriously reprimanded—that in some mysterious way employees on the staff seem to have access to material that apparently is in camera at the Federal Trade Commission. I say to you that you are in error again. I use as an example the one you used. You said there is an identical document in yesterday's record that was submitted in that case. Admiral Knickerbocker and Commander Weiss informed us that they had observed this curious phenomenon. I asked them would they prepare a document for us. If it is identical with the one at the Federal Trade Commission, so be it. But it was prepared by the MMSA at my request.

You have also inferred that these documents that I have offered here are fragmentary. I do not know what prompted the Commission's counsel to make the decision they made. I personally have not talked to them. I do not care what prompted them. All I say to you is that Mr. Weeden prepared these

documents in response to a request for costs. He did not call them fragmentary, he did not call them complete. He said, "This is our costs." And in these documents that we are talking about, in answer to a request for "How much profit are you going to make?" he replied, "This is how much profit we are going to make."

I don't know what Price Waterhouse has done for you. I don't know to what documents they were given access. But if you will give us access to your books and records, we will send people there, and we will determine your costs—if you want to take us up on that offer. Give us the same access that you gave Price Waterhouse, and we will get the truth. That is what we are after here—not fragments—but the truth. You have inferred we are playing with fragments, you have inferred that we have some kind of secret liaison with somebody who is trying your case, which is far from the truth.

Mr. Clark. All I am saying, sir, is that the proceedings that are going on here bear a remarkable resemblance to the proceedings that went on there. And I do not think we should have to fight this battle twice. At least not twice at the same time.

Senator Kefauver. Let us get this matter in perspective.

In the first place, Mrs. Wendt has been for many years an employee of the Patent Office. She was asked to come on a loan basis to the Federal Trade Commission, and help with a report on antibiotics. Her assistance on that report had nothing to do and no connection whatsoever with any case that you were involved in.

Mr. Clark. I am glad to be corrected, sir.

Senator Kefauver. No employee of this committee has been involved in that case.

While some members of the staff have formerly been employed by the Federal Trade Commission, their connection has been entirely severed, and none of them has ever had any connection with any case that you have been involved in. None of them has any method of establishing any liaison, or of getting any files. We do not operate that way.

What we have secured here has been received by subpena from your company. We have been given nothing by the Federal Trade Commission.

Mr. Dixon. Bristol Laboratories is one of the three manufacturers of tetracycline in the United States; isn't that correct, sir?

Dr. Bowman. That is correct.

Mr. Dixon. There are a total of five, as we learned the other day, that sell this drug.

You sell tetracycline in bulk form, and in some preparations, I understand, finished form, do you not, to Squibb and Upjohn?

Dr. Bowman. That is correct.

Mr. Dixon. In your statement, as I told you this morning, when you were recruiting the difficulties of your company, I believe you recited the fact that through your research program you were ever striving to develop a new antibiotic product. You said that you did develop one, and that you found out about the same time that others had developed one; is that correct?

Dr. Bowman. That is correct.

* * * * * *

Mr. Dixon. Mr. Chairman, on that point, in examining some of the exhibits in the case before the Federal Trade Commission, I found Commission exhibit 942 which came from Upjohn's file. It is a report that concerned a meeting with Donald Gilmore of Upjohn. This is dated September 20, 1954.

Dr. Bowman. Do you have any extra copies of that, by any chance?

Mr. Dixon. I have none, but after I read it, I will send it over to you. I am reading from the third page.

Bristol is a raw material supplier making tetracycline at the present time, and not long ago Pfizer offered

to settle the contest with Bristol if Bristol would sell only one customer and that customer to be Parke, Davis, Bristol said they had decided to sell two customers and one of them was to be E. R. Squibb & Sons, but Bristol would offer to sell Parke, Davis as the second, in hopes that Pfizer would settle for those two.

Bristol made a deal with Squibb and was turned down by Parke, Davis on account of the price of the material. We were next on Bristol's list.

Do you care to make a comment on that?

Mr. Clark. Mr. Chairman—

Mr. Dixon. It says on the next page:

They offered to sell us and we accepted last week the same as Squibb did about a month ago.

Mr. Clark. I hate to keep objecting on the same ground, but this document, as Mr. Dixon says, is indeed an exhibit in the Federal Trade Commission case. Mr. Gilmore, who is purported to be quoted there testified about it. A lot of other people testified about it. There must be a thousand pages of testimony on that subject.

Mr. Dixon. But the chairman was interrogating Dr. Bowman on how it had come about that there was just two customers to whom he was selling. He was stating that he could sell to anybody else. This statement here is directly contrary to it. I think you ought to comment on it.

Mr. Clark. Well, it puts us really in a most difficult position.

I think the license agreement which was entered into 2 years almost after what you read speaks for itself as to whether it is or is not limited or unlimited, and it frankly seems to me unfair to ask us to comment on some little excerpt from thousands of pages in a record in the other proceeding.

Senator Kefauver. Mr. Clark, it certainly is not unfair to ask you about it because it is a very important matter

whether four or five companies got together and worked this matter out. That is a matter of congressional importance in connection with whether there is the rigidity of prices or whether the antitrust laws need to be amended. Your statement is that there wasn't any such agreement, as Dr. Bowman has said. Why, then, that is the end of it so far as we are concerned.

Mr. Clark. All right, sir. I have no objection to going that far, but we open up one question and then they seem to follow one another like sausages and it is hard to know when to ask you to put a stop to them.

Mr. Dixon. The sausage was apparent, sir. He had answered differently from this question that I have read. He had put the matter in issue. He said there was no such agreement and here is a statement that says there was. Now, is that statement right, Dr. Bowman?

Dr. Bowman. I did not make that statement. In fact, it is hearsay as far as I was concerned.

Mr. Dixon. Is it a true statement as far as you know?

Dr. Bowman. No.

Mr. Dixon. All right. You made your statement.

Senator Kefauver. Is the license agreement a part of the record?

Mr. Dixon. It is not a part of our record, Mr. Chairman, because we can take notice of a public document before the Federal Trade Commission. But if you want to put the domestic license agreement in this record we can do it. It may well be that we will put in the record all the license agreements, because we have been talking about them.

Senator Kefauver. I think the license agreement with Upjohn, Squibb, and Pfizer would be of interest.

Mr. Dixon. I have here all of the domestic license agreements dealing with tetracycline. I would suggest, sir, that they be given one number, and that num-

ber be No. 72 with subdesignations A, B, C, and so forth.

Senator Kefauver. If there is no objection, that will be done.

## APPENDIX F

SUITS INSTITUTED BY PFIZER FOR INFRINGEMENT OF
TETRACYCLINE U. S. PATENT NO. 2,699,054 AS REPORTED IN
OFFICIAL GAZETTE OF U. S. PATENT OFFICE

| Defendant | Filed | Court | Civil Action No. |
|---|---|---|---|
| Olin Mathieson Corp. | 1/11/55 | ND Ga. | 5082 |
| The Upjohn Co. | 1/11/55 | ND Ga. | 5083 |
| Bristol Laboratories, Inc. | 1/11/55 | ND Ga. | 5084 |
| Mondial Chemical Co., et al. | 10/25/60 | D. N.J. | 927–60 |
| Noramco | 2/ 8/61 | WD Tex. | 2929 |
| Philipp Bauer Co., Inc. | 4/13/61 | SD N.Y. | 61/1320 |
| Int'l Rectifier Corp., et al. | 10/ 2/62 | SD Cal. | 62/1350 CC |
| Int'l Drug Trading, Inc., et al. | 8/28/63 | ED Mich. | 24280 |
| Premo Pharmaceutical Labs, Inc. | 9/20/63 | D. N.J. | 766–33 |
| TMCO Pharmaceuticals, Inc. | 9/30/63 | ED Mo. | 63C–364 |
| Narco Drug Co., Inc. | 9/30/63 | ED Mo. | 63C–363 |
| Hallmark Labs, Inc. | 11/12/63 | ND Ill. | 63C–2026 |
| Zenith Labs, Inc., et al. | 11/12/63 | D. N.J. | 936–63 |
| Approved Pharma. Corp. | 11/12/63 | ND N.Y. | 9832 |
| Davis-Edwards Pharmacal Corp. | 11/13/63 | SD N.Y. | 63 C 3327 |
| Pennex Products Co. | 11/14/63 | WD Pa. | 63–1011 |
| West-Ward Inc. | 12/12/63 | SD N.Y. | 63 C 3619 |
| Pennex Products Co. | 1/23/64 | SD N.Y. | 64 C 233 |
| Vitamix Pharmaceuticals, Inc. | 2/19/64 | ED Pa. | 35119 |
| Hance Bros. & White Co. | 3/11/64 | ED Pa. | 35120 |
| Columbia Pharmaceutical Corp. | 3/11/64 | ED N.Y. | 64C–258 |
| Barry Martin Pharma., Inc. | 3/19/64 | SD Fla. | 64–175 Civ-EC |
| Delta Drug Corp., et al. | 3/25/64 | MD Fla. | 64–71–J |
| Ortega Pharmaceutical Co., Inc. | 3/25/64 | MD Fla. | 64–72–J |
| Garden Labs, Inc. | 4/13/64 | D. N.J. | 341–64 |
| City of New York, N. Y. | 6/ 4/64 | SD N.Y. | 64 Civ. 1742 |
| Freedman Pharmacy | 6/26/64 | ED Pa. | 36060 |
| Stoneham Lab, et al. | 7/16/64 | ED N.Y. | 64C–752 |
| McKesson & Robbins, Inc. | 8/11/64 | D. Conn. | 10,600 |
| Evsco Pharma. Corp. | 1/11/65 | ED N.Y. | 65C–18 |
| Diamond Labs., Inc. | 3/29/65 | SD Iowa | 6–1652–C–2 |
| Biocraft Labs., Inc. | 3/29/65 | D. N.J. | 323–65 |
| Bates Labs., Inc. | 3/29/65 | ND Ill. | 65C–486 |
| Henry Schein | 5/ 5/65 | ED N.Y. | 65C–475 |
| Wolins Pharmacal Corp. | 6/ 1/65 | ED N.Y. | 65C–543 |
| Mike Berk Associates | 6/ 1/65 | SD Cal. | 65–810 EC |

Public notice of the above litigation appears in the Official Gazette of the United States Patent Office, under the authority of 35 U.S.C. § 11:

692 O.G. 534; 761 O.G. 289; 765 O.G. 313; 767 O.G. 292; 784 O.G. 1142; 798 O.G. 9; 799 O.G. 8; 799 O.G. 393; 800 O.G. 630; 802 O.G. 325; 806 O.G. 956; 815 O.G. 1657.

## APPENDIX G

For example, the hearing examiner made findings of fact that both Lidoff and the parties knew "that aureomycin fermentations inherently produced tetracycline;" that "Pfizer did not withhold or misrepresent any information concerning inherent production;" and that none of the three parties to the Patent Office proceedings, Pfizer, Cyanamid or Bristol, made any misrepresentations to the Patent Officer "concerning the fact that aureomycin fermentations

usually contained some percentage of tetracycline." The hearing examiner further found that:

"The various patent applications for tetracycline by fermentation, namely, Minieri, Martin-Bohonos, and Heinemann, all revealed that in the fermentation of *S. aureofaciens*, both Aureomycin and tetracycline were produced in the broth and substantial quantities of tetracycline were produced when the chlorine content of the media was eliminated or kept to a minimum. It must be noted that there is an important distinction between the presence or production of tetracycline in the fermentation broth and the presence of tetracycline in the resultant product. The Minieri application described a process which resulted in the production of substantial quantities of tetracycline in the broth, making possible the recovery of the therapeutic product, tetracycline, from such broth. The discovery of the fact that tetracycline could be produced by fermentations of *S. aureofaciens* led inevitably to the discovery that *S. aureofaciens* fermentations to produce Aureomycin necessarily produced some tetracycline in the broth, the amount depending upon the chlorine content of the media. Inasmuch as the Aureomycin media normally contained a relatively high amount of chlorine, such broths contained a relatively small amount of tetracycline.

"By the fall of 1953, it was general knowledge in scientific circles that in the preparation of an Aureomycin broth by the fermentation of *S. aureofaciens*, some percentage of tetracycline was coproduced. This fact was also known by the Patent Office, because its examiners and scientists keep abreast of such developments, but more specifically because it had been disclosed in the three fermentation applications, particularly Minieri, all of which were before the same patent examiner who passed upon the Conover application. In addition, in the fall of 1953, an antibiotics symposium

was held, at which the public discussion revealed as general knowledge the fact that tetracycline was inherently produced in Aureomycin broths. However, the fact that tetracycline was present in the resultant product, Aureomycin, was not known at this time and did not become known by the Patent Office until January 3, 1955."

To the contrary, the Commission held:

"The hearing examiner dismissed the above charge for the reason that any misstatements of fact or withholding that the record discloses pertains to matter which was immaterial to the Patent Office's determination of the validity of Conover's product claims. We disagree. *We find that the hearing examiner's decision is based on a misunderstanding of the patent examiner's rulings on tetracycline.* The hearing examiner's entire decision on this phase of the case contains a series of deductions from certain erroneous assumptions. He assumes (erroneously) that the Patent Office examiner, Lidoff, dissolved the second interference and rejected the Conover (Pfizer) product claims on the speculation that tetracycline, as an inherent part of commercial Aureomycin products, had been in *public use or on sale* more than one year before the date of Conover's application. From this, and from certain conclusions of law based on decisions that Lidoff never relied upon, he reasons that Lidoff must have been interested only in whether tetracycline was present in the final commercial product of Aureomycin and whether it was present in 'substantial quantities' so as to impart utility to that product. From this he reasons that Lidoff's motive in requiring Pfizer to run tests was to determine whether tetracycline was present in the broth in (again) 'substantial quantities' so that such quantities could have been recovered along with Aureomycin. From this conclusion and from erroneous findings that Lidoff always knew of coproduction of tetracycline in smaller amounts (less than 'substantial') in

the prior art processes and that Pfizer 'conceded' that tetracycline constituted ten percent of Aureomycin, he reasons that no *material* misrepresentation or withholding of information occurred because the evidence shows that tetracycline almost always constituted something less than ten percent of Aureomycin.

"The Commission contrary to the above conclusions by the hearing examiner, finds that:

"(1) The patent examiner did not reject Conover's product claims on the ground that tetracycline may have been in public use or on sale more than one year before the date of Conover's application, but rather his rejection was based on the ground that it appeared that tetracycline was inherently produced by the fermentation processes described in the Duggar and Niedercorn patents and for the reason of inherent production alone would be unpatentable.

"(2) Nowhere in the documents before the patent office did respondents or the patent examiner even allude to the public use and sale theory.

"(3) The patent examiner informed Pfizer that he would not allow tetracycline product claims unless Pfizer submitted affidavits in which Pfizer scientists swore they could not recover tetracycline from broths representative of those described in the Duggar and Niedercorn patents.

"(4) Pfizer submitted such affidavits and the examiner allowed the claims, thereby enabling Pfizer to obtain a patent on the product tetracycline.

"(5) Pfizer deliberately made false and misleading statements regarding the affidavit tests and suppressed the fact that Pfizer had previously found that tetracycline was produced by one of these fermentation processes.

"(6) The patent examiner did not previously know that inherent production occurred in any of these processes and was not told of this fact by Pfizer,

nor did Pfizer concede that tetracycline constituted ten percent of Aureomycin (or any other percentage, for that matter).

"(7) The false statements and information withheld were material to the patent examiner's determination of the patentability of tetracycline and were known by Pfizer to be material.

"To come to any other conclusion would be to torture the English language and make semantics rather than facts the basis for our rulings.

\* \* \* \* \*

"[T]he hearing examiner erroneously finds that Lidoff was interested only in whether tetracycline was present in commercial aureomycin products. From this and from certain conclusions of law . . . the hearing examiner reasons that Lidoff must necessarily have been interested only in whether tetracycline was present in commercial products in 'substantial quantities' so as to impart utility to the commercial product."

The hearing examiner concluded that Patent Examiner Lidoff drew a distinction between coproduction or inherent production as applied to process applications on the one hand and product applications on the other, saying:

"The disclosures of Minieri, Heinemann and Martin-Bohonos, as well as other sources of information, revealed to the patent examiner the fact that tetracycline was inherently produced in Aureomycin broths. The disclosure of Minieri, dealing with fermentations producing substantial quantities of tetracycline, i. e., a process of fermenting *S. aureofaciens* in a media which produced 'concentrations making possible the recovery of the therapeutic product,' led the examiner to speculate that, in following the teachings of Duggar and Niedercorn, since tetracycline was inherently produced in the broths it might have been produced in concentrations making possible the recovery of the therapeutic product. Accordingly, in connection with prod-

uct claims, he wished to ascertain if this were the fact. If the concentration were sufficient to make possible the recovery of tetracycline in the end product, Aureomycin, then the prior art product might well have possessed the same utility possessed by tetracycline.

"However, the same considerations did not apply with respect to process applications. Most of the Patent Office's rejections of tetracycline claims because of the inherent production of tetracycline under the Duggar and Niedercorn processes for making Aureomycin concerned process applications and not product applications. There are several obvious reasons why the inherent production of tetracycline in any amount in Aureomycin broths would bar claims for process patents substantially the same as the Duggar and Niedercorn processes, but it would unduly lengthen this decision since it is unnecessary to discuss them here. Whatever the reasons, it is clear that the Patent Office distinguished process claims from product claims with respect to rejections on the basis of inherent production of tetracycline. * * *

"It is clear that the Patent Office, and particularly Examiner Lidoff, distinguished between the amount or substantiality of inherent production in considering its effect upon the patentability of process applications and product applications.

\* \* \* \* \* \*

"It is clear that the patent examiner considered the coproduction of tetracycline with aureomycin in the *process,* i. e. the fermentation of *S. aureofaciens,* as relevant to the process applications, and considered the coproduction of tetracycline in the resultant *product* as relevant in the *product* applications." (Emphasis that of hearing examiner.)

The Commission held to the contrary:

"In support of his conclusion that Lidoff was interested only in knowing whether substantial quantities of tetracycline were coproduced, the hearing examiner theorizes that Lidoff applied different standards for product and process claims—that any amount of prior production would anticipate a process claim, but that only the production of 'substantial' amounts would anticipate a product claim. There is no indication that Lidoff so regarded the law. It appears that the source of this distinction lies in the fact that the hearing examiner, in imputing the 'public use and sale' theory to Lidoff, could not otherwise account for process claim rejections."

The hearing examiner held that Mr. Lidoff was not deceived or misled by the information withheld by Cyanamid, but that he already was familiar with all information which Cyanamid is charged with withholding. The Commission held to the contrary.

The hearing examiner placed much emphasis upon the fact that Bristol filed an affidavit with the Patent Office January 3, 1955, six days before the tetracycline patent was issued, disclosing in detail the presence of two to four per cent tetracycline in old aureomycin, saying:

"This disclosure, together with the interview statements of the examiner and the affidavits heretofore considered clearly establish that the Patent Office did not consider the presence of 2 to 4%, or small amounts, of tetracycline in Aureomycin a bar to patentability. It also corroborated the statement made by Pfizer that the resultant product might be assumed to contain 10% or less tetracycline.

"The Taylor affidavit establishes that the Patent Office was not of the opinion that Pfizer had misrepresented or withheld such information from the Patent Office. It was filed with Lidoff, the same examiner handling the Conover application. Patent Office Rule 313 specifically provides that after a notice of allowance is issued, the application may be withdrawn by the Patent Office on the basis of mistake on the part of the Office or because of

fraud or illegality in the application. If, as contended, Pfizer had misrepresented and Pfizer, Cyanamid and Bristol had withheld such information concerning inherent production, this affidavit revealed this information to the Patent Office and in conformity with Rule 313 the patent would not have been issued. In addition, Rule 56 states that any application may be stricken from the files which is fraudulently filed, or in connection with which any fraud is practiced or attempted on the Patent Office. If the Patent Office, as contended, would not have issued the patent if it had been aware of any inherent production in the prior art, or that such information had been withheld or misrepresented, then the filing of the affidavit would have revealed this, the Patent Office would not have issued the patent, and it would have had serious reason to question the claimed misrepresentation by Pfizer. On the contrary, this affidavit corroborated the statement made by Pfizer that not more than 10% of the recovered product was tetracycline. It also corroborates the finding herein that the patent examiner, as he stated, was interested only in appreciable amounts of tetracycline making possible its recovery as a therapeutic product."

The Commission also disagreed on this point, saying:

"Six days before the issuance of the Pfizer patent on January 11, 1955, Lidoff's division received an affidavit from Bristol (the Taylor affidavit) in connection with Bristol's Heinemann application, which stated that 2 to 4% of tetracycline had been found in Aureomycin products, including the products that had been placed on the market before the date of the Conover discovery of tetracycline. The hearing examiner, at page 88 of his decision, uses this as the basis for his conclusion that Lidoff *knew* that tetracycline was inherently produced and *therefore* he must have ruled that this was not enough tetracycline in old Aureomycin

products to impart utility thereto, otherwise he would have taken action to halt the issuance of the patent.

"This reasoning cannot be accepted for several reasons. As explained in our Findings the Taylor affidavit did not refute Pfizer's tests. In addition, Lidoff could not make reference to such an affidavit in rejecting the Conover claim since it was filed in a confidential *ex parte* proceeding. Bristol, in filing the Taylor affidavit, did not waive its right to secrecy in regard to its Heinemann application. Therefore, Lidoff, even if his suspicions had been aroused by the Taylor affidavit, could not have shown the basis thereof since the only evidence in the Conover file wrapper was an affidavit by an apparently equally reputable scientist as Dr. Taylor which stated categorically that no tetracycline was recovered from the broth fermented with NRRL–2209."

The hearing examiner made the following summary of his findings concerning the inherent production of tetracycline in aureomycin:

"The facts concerning the inherent production of tetracycline in Aureomycin have already been found. It has been found that the Patent Office was aware of the fact that tetracycline was inherently produced in Duggar and Niedercorn fermentation broths and was interested in ascertaining whether appreciable quantities of tetracycline had been produced making possible the recovery of the therapeutic product. It has been found that Pfizer made no misrepresentations to the Patent Office concerning this subject, and in fact advised the Patent Office to assume that as much as 10% tetracycline was present in the product recovered by the Bogert tests. It has been found that tetracycline in fact was present in the prior art product in amounts ranging from 2 to 5% and that this fact was called to the attention of the Patent Office by Bristol's affidavit filed before the issuance of the patent."

The Commission held:

"The Commission, on the basis of the record, cannot accept the hearing examiner's finding that by the fall of 1953 it was known by all, including Lidoff, that coproduction occurred in the Duggar and Niedercorn processes. The hearing examiner fails to understand that the fermentation applications submitted to Lidoff concerned processes which allegedly produced tetracycline for the *first time* by fermentation because they differed from the Duggar and Niedercorn processes in that they used an environment substantially free of chloride ions and used newly discovered microorganisms.

\* \* \* \* \* \*

"Throughout his decision, the hearing examiner equates the following terms with one another—'recoverable quantities,' 'appreciable quantities,' and 'substantial quantities.' The record nowhere indicates that Lidoff used the term 'substantial quantities' as signifying what he considered to constitute coproduction. Lidoff never used the term 'appreciable quantities' in his rejections. This term was used only in the 'Remarks' and affidavits filed by Pfizer in December 1954. Hutz, the author of the 'Remarks,' conceded on the witness stand that 'appreciable quantities' was used synonymously with 'recoverable quantities' and it is clear from the context in which the term was used that it was so intended.

\* \* \* \* \* \*

"The Commission, contrary to the above conclusion of the hearing examiner, finds that Pfizer made false statements to the Patent Office and withheld material information. The record shows that Lidoff was not interested in ascertaining any particular percentage figure of coproduction but wanted to know whether tetracycline could be recovered in clearly identifiable form from any of the media described in the Duggar and Niedercorn patents using the deposited microorganism NRRL–2209. The record indicates that Lidoff believed that Example 28 because of its low chloride ion content, was the most favorable of the media in Niedercorn for the production of tetracycline. Pfizer had discovered from previous tests that little potency was obtained using NRRL–2209 in the Example 28 medium. Dr. Bogert, in October 1954, determined that higher potencies were obtained using Example 1 of Niedercorn and that tetracycline was coproduced with Aureomycin. Neither Bogert nor his superiors revealed this fact to the Patent Office."